# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

DONTAZE A. STOREY,

                              Petitioner,

v.

DANIEL PARAMO, Warden,

                              Respondent.

Case No.:  17cv0023-LAB(MSB)

**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     Dontaze A. Storey is a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 48.)    Petitioner challenges his San Diego County Superior Court conviction of nineteen counts of committing a lewd act upon a child under fourteen years of age and two counts of failure to register as a sex offender, for which he was sentenced to 185-years to life plus 40 years.  He claims his federal constitutional rights were violated by introduction of a prior conviction for committing a lewd act upon a child under fourteen years of age as propensity evidence while excluding evidence the victim recanted (claim one), erroneous jury instructions on the use of prior inconsistent statements of a victim (claim two) and the statute of limitations (claim three), the cumulative effect of those errors (claim four), as well as ineffective assistance of trial and appellate counsel, and prosecutorial and judicial misconduct (claim five).  (Id. at 6-56; ECF No. 1 at 6, 32-58.)

Respondent has filed an Answer and lodged the state court record. (ECF Nos. 53, 54.) Respondent contends habeas relief is unavailable because the jury instruction claims are not cognizable on federal habeas, state court remedies are not exhausted as to the cumulative error claim, claim five is untimely, and the state court adjudication of the first four claims is neither contrary to, nor an unreasonable application of, clearly established federal law. (Memo. of P&A in Supp. of Answer ("Ans. Mem.") [ECF No. 53-1] at 1-31.) Petitioner has filed a Traverse. (ECF No. 56.)

The Court recommends that federal habeas relief be denied as to claims one through three, which were presented in state court on direct appeal, because the adjudication by the state court is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts, and any errors are harmless. Although claims four and five are subject to procedural bars in this Court due to the manner in which they were presented in state court, the Court recommends denying habeas relief on the merits of those claims irrespective of any procedural bars because they clearly fail under a de novo review.

# I.  **PROCEDURAL BACKGROUND**

On October 18, 2013, a jury found Petitioner guilty of two counts of committing a lewd act on his daughter I.S., a child under the age of fourteen years, in violation of California Penal Code § 288(a), seventeen counts of committing a lewd act upon his daughter V.S., a child under the age of fourteen years, in violation of Penal Code § 288(a), and two counts of failing to register as a sex offender in violation of Penal Code § 290.018(b). (Lodgment No. 1, Clerk's Tr. ["CT"] at 259-81.) The jury returned true findings that the charges involving V.S. were brought within the one-year statute of limitations, that Petitioner had substantial sexual contact with I.S., that he committed the offenses against more than one victim, and that he had been convicted in 1995 for committing a lewd act on his daughter E.S., a child under the age of fourteen years, in violation of Penal Code § 288(a). (Id.) They were unable to reach a verdict as to four counts of committing a lewd act upon his daughter K.S., a child under the age of fourteen

years, in violation of Penal Code § 288(a), and a mistrial was declared as to those counts. (CT 624.) Petitioner admitted he had been convicted in 1995 of committing a lewd act on his daughter E.S., and on November 19, 2013, was sentenced to 185-years to life plus 40 years in prison. (CT 625-30.)

Petitioner appealed, arguing, as he does in his first four claims here, that: (1) he was denied his rights to due process, compulsory process, cross-examination, and to present a defense when he was precluded from introducing evidence E.S. admitted she fabricated the allegations on which his 1995 conviction was based, (2) the jury was erroneously instructed they could not consider for their truth statements by I.S. during forensic interviews in which she denied Petitioner molested her, but could only consider them as they related to the opinion of a defense expert on the reliability of child abuse victim reporting, (3) the jury was erroneously instructed that the one-year statute of limitations began to run when V.S. informed police in 2011 that Petitioner molested her in 1988, rather than from when she made a similar report to Child Protective Services in 2005, and (4) he was prejudiced by the cumulative effect of those errors. (Lodgment No. 3.) The appellate court affirmed. (Lodgment No. 5, People v. Storey, No. D065025, slip op. (Cal.App.Ct. Sept. 30, 2015).) On November 9, 2015, Petitioner filed a petition for review in the California Supreme Court presenting the same claims, absent the cumulative error claim. (Lodgment No. 6.) That petition was summarily denied. (Lodgment No. 7, People v. Storey, No. S230504, order (Cal. Jan. 21, 2016).)

After constructively filing his original pro se Petition in this Court on December 29, 2016, Petitioner constructively filed a pro se habeas corpus petition in the state supreme court on May 18, 2017, alleging, as he does in claim five here, ineffective assistance of trial counsel, and judicial and prosecutorial misconduct.[1] (Lodgment No. 8.)

---

[1] Petitioner is entitled to the benefit of the "mailbox rule" which provides for constructive filing of court documents as of the date they are submitted to the prison authorities for mailing to the court. Anthony v. Cambra, 236 F.3d 568, 574-75 (9th Cir. 2000). All filing dates for Petitioner's pro se filings set forth herein are constructive filing dates.

17cv0023-LAB(MSB)

That state petition was denied on August 16, 2017, in an order which stated:

> The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474 (a petition for writ of habeas corpus must include copies of reasonably available documentary evidence); *In re Swain* (1949) 34 Cal.2d 300, 304 (a petition for writ of habeas corpus must allege sufficient facts with particularity.).) Individual claims are denied, as applicable. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 (courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal).) Corrigan, J., was absent and did not participate.

(Lodgment No. 9.)

On January 5, 2018, Petitioner filed a second habeas petition in the state supreme court raising the same claims with additional evidentiary support, in addition to the ineffective assistance of appellate counsel claims presented in claim five here. (Lodgment No. 10.) That petition was denied on April 11, 2018, with an order which stated:

> The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750, 767-769 (courts will not entertain habeas corpus claims that are successive); *People v. Duvall* (1995) 9 Cal.4th 464, 474 (a petition for writ of habeas corpus must include copies of reasonably available documentary evidence); *In re Swain* (1949) 34 Cal.2d 300, 304 (a petition for writ of habeas corpus must allege sufficient facts with particularity.).) Individual claims are denied, as applicable. (See *In re Miller* (1941) 17 Cal.2d 734, 735 (courts will not entertain habeas corpus claims that are repetitive).)

(Lodgment No. 11.)

## II.    EVIDENCE PRESENTED AT TRIAL

Petitioner was charged in counts 1-4 with committing lewd acts upon his daughter K.S. (born in 2006), between October 19, 2006 and October 19, 2011, was charged in counts 5-6 with committing lewd acts upon his daughter I.S. (born in 2004), between December 9, 2004 and October 19, 2011, and charged in counts 7-22 with committing lewd acts upon his daughter V.S. (born in 1974) between April 1, 1988 and July 24, 1988, when they were all under fourteen years of age. The jury was asked to determine if the charges against V.S. were filed within one year of her reporting her allegations to the police, if Petitioner had been convicted in 1995 for committing a lewd act upon his daughter E.S.

4

(born in 1988), when she was under fourteen years of age, if he had substantial sexual contact with I.S., and if he committed the offenses against multiple victims.

Esther Singleton testified that Petitioner is her ex-husband and their child E.S. was born in 1988. (Lodgment No. 2, Reporter's Tr. ["RT"] at 1201-02.) They were married and living in a one-bedroom apartment in Los Angeles when E.S. was born, along with Esther's then 10-year old son Devon. (RT 1202-04.) In the spring of 1988, when Esther was pregnant with E.S., Petitioner's daughter V.S., who was 13 at the time, moved in with them. (RT 1204.) Devon and V.S. slept in bunk beds in the bedroom with Devon in the top bunk and V.S. in the bottom, while Esther and Petitioner slept on a pull-out bed in the living room. (Id.) Esther awoke around 2:00 a.m. one morning about a month after V.S. moved in, and saw Petitioner in the bedroom with the door closed wearing only underpants kneeling next to V.S.'s bunk. (RT 1205-06, 1215-21.) Petitioner jumped up and said they were just talking, but Esther thought it was inappropriate, although she did not see any sexual activity and could not see if V.S. was awake or her state of dress. (Id.)

Esther said that Petitioner no longer had any romantic or sexual interest in her after V.S. moved in, and spent all his time with V.S. (RT 1207.) V.S. often walked around the apartment wearing only panties and a shirt without a bra, sat on Petitioner's lap that way, and he often wore only underpants around the apartment. (RT 1208-09.) Petitioner often said, in front of V.S., that: "The father should have his children or his girls before they have marriage or relationships with anybody else," to which Esther would reply: "They may have done those things back in the day in Africa, but they don't do those things here today." (RT 1209-11.) Esther said she was addicted to crack cocaine during their marriage and worked as a prostitute before they were married. (RT 1210-11.) Petitioner was granted custody of E.S. when they separated in late 1988 or early 1989, and he moved to his mother's house in San Diego with E.S. and V.S. (RT 1212.)

Karen Spearman testified that she and Petitioner lived in a two-bedroom apartment in San Diego for six months beginning in late 1989. (RT 1235-36.) Petitioner's daughter V.S., who was 14 at the time, lived with them, and V.S. slept in one bedroom while

Petitioner and Spearman slept in the second bedroom. (RT 1237-38.) While they were living together, Petitioner and V.S. were often naked in front of each other. (RT 1238.) Spearman told them she thought it was inappropriate and asked them to stop, but Petitioner said they did it before he met Spearman. (RT 1238-39.) On one occasion, Petitioner, while naked, entered the bathroom while V.S. was in the shower and closed the door, and they both came out naked about five minutes later. (RT 1240.) On another occasion Spearman returned home from work to find the front door chained, and Petitioner was slow to answer her knock. (Id.) He and V.S. were both naked when he let her in, and Petitioner said they had been cuddling in bed together naked because V.S. was upset and needed to be cuddled. (RT 1241-42.) It seemed to Spearman that Petitioner and V.S. were like a couple who were "comfortable being naked in front of one another," and although V.S. never admitted anything inappropriate between her and her father, Spearman left Petitioner because of the inappropriate behavior between him and V.S. (RT 1242-44.)

Freddy Arch testified that he was Petitioner's neighbor and part-time co-worker when they lived in Lemon Grove in 1994, doing handiwork and home repair together. (RT 1261-62.) Petitioner lived with his daughter V.S., who was about 19 at the time. (RT 1262.) Arch testified that Petitioner showed no interest in older women but often flirted with girls between 15 and 17 years old, and made comments about how he would like to have oral sex with them. (RT 1264-65.) On one occasion while they were working Petitioner pointed out a girl about 13 or 14 years old who walked by, told Arch to check her out, and commented on her breasts. (RT 1265.) Arch worked with an 18 year old woman, and Petitioner came by almost every day to visit him and see her, and said he wanted to have sex with her. (RT 1266-67.) Petitioner made similar comments about a 17 year old woman who worked at a grocery store, and said he wanted to meet her and make love to her with his mouth. (RT 1267-68.)

V.S. testified that Petitioner is her father, she was born in Los Angeles in 1974, and she moved to New York with her mother when she was four years old before ever meeting Petitioner. (RT 1281-84.) V.S. was placed in foster care in New York for about two years

because her mother had a mental breakdown when V.S.'s grandfather died. (RT 1284.) V.S. moved back to Los Angeles with her mother when she was 9 years old, where they lived with her mother's family. (RT 1285.) When V.S. was 11, Petitioner found out she was living in Los Angeles and came to meet her, although her family was reluctant for them to meet, and they had a long conversation. (Id.) V.S. wanted a father-daughter relationship, and Petitioner visited her almost every day, bringing her beef jerky and root beer, hanging out and talking. (RT 1286.) During the Christmas holidays when she was 11 or 12, she visited Petitioner at his house in the mountains of Los Angeles, and while she was laying on the sofa he touched her vagina with his hand. (RT 1286-87.) She moved away but was too shocked to say anything. (RT 1287-88.) Petitioner did not say anything either, and their relationship continued as it was before. (RT 1288.)

V.S. said that in April 1988, when she was 13, her mother was having mental health issues and was violent and abusive toward her, so she decided to live elsewhere. (RT 1288-90.) Petitioner was living with V.S.'s stepmother Esther and her son Devon in Los Angeles at that time, and when Petitioner suggested she move in with them she agreed. (RT 1290-92.) She shared a bedroom with Devon who slept in a top bunk bed while she slept in the bottom. (RT 1292.) Petitioner and Esther seemed to be in love, and Petitioner was loving and kind toward V.S. (RT 1292-94.) One night soon after she moved in she was lying in her bunk and awoke to find Petitioner touching her vaginal area with his hand. (RT 1294-95.) She jumped up and was angry, and Petitioner took her into the bathroom and asked what was wrong and why she was angry. (RT 1295.) She told him she was angry because he was touching her, and he replied "you're not angry because I'm touching you. You're angry because you like it." (Id.) She said she was confused and "felt nasty," and did not tell Esther because she was violent and hostile like her mother, and did not tell her mother because they were not speaking to each other at the time. (RT 1295-96.)

Petitioner drove a van for his work, and almost immediately after that first touching incident he began touching and placing his mouth on her vagina in the van, which continued nearly every day thereafter. (RT 1296-97.) During a court hearing while he was attempting

17cv0023-LAB(MSB)

to obtain custody of her, he took her to the van in the parking lot during a recess and performed oral sex on her, and when they went back into the courtroom he was granted custody. (RT 1298.) When asked if she wanted to stay with Petitioner at that time, V.S. said she was confused and "didn't feel I had a choice," as she did not want to go back to her mother and had felt abandoned during foster care. (Id.) She said Petitioner made her feel special, made her feel that she was his baby girl, and told her if she was not his daughter he would marry her. (RT 1299.) He continued to give her gifts, and gave her anything she asked for, but also introduced her to, and encouraged her to use, alcohol and marijuana. (RT 1300-01.)

On one occasion while they were in the bathroom together, Petitioner asked her to give him oral sex. (RT 1303.) While V.S. was attempting to do so, Esther tried to open the door but Petitioner prevented her from coming in, and they both denied anything had happened. (Id.) The first time V.S. had intercourse with Petitioner was when she was 14. (RT 1306.) They were drinking beer and smoking marijuana and went to a hotel where they had intercourse, and they had oral sex or intercourse at least once a day after that, either in hotels or his van. (RT 1306-09.) Around that time she had a boyfriend, and on one occasion when he spent the night at their apartment, Petitioner asked her to come sleep with him and told her if she did not have sex with him he would send her boyfriend home, so she had sex with Petitioner. (RT 1310-11, 1373-74.)

V.S. moved to San Diego with Petitioner in the fall of 1989, when she was 15, lived with him until she was 20, and continued having sex with him every day until he went to jail for a case involving his daughter E.S. (RT 1311-17, 1321.) V.S. felt guilty about their relationship but did not tell anyone because: "I really relied on and depended on and trusted my dad. I was in no condition to take care of myself as an individual or as a grown-up. And I still felt like a child. I didn't trust anyone to tell them anything. I didn't think, even if I did tell them, they could help me." (RT 1318.) She testified at Petitioner's 1995 criminal trial for molesting her sister E.S., and admitted she testified falsely at that trial that Petitioner had never molested her, explaining she was ashamed of herself at the time and,

because she had nowhere else to live, was afraid Petitioner would be taken away. (RT 1319-20.) The parties stipulated that Petitioner was the person named as the defendant in the certified copy of the 1995 conviction. (RT 1320.) V.S. said she stayed with Petitioner and continued to have sex with him while he was on trial for the charges involving E.S., and that their sexual relationship ended only because he was convicted and went to prison. (RT 1321.) She said Petitioner videotaped them having sex on one or two occasions. (RT 1323.) A short clip of one of those videos was played for the jury, which showed only a close up view of a vagina. (RT 1327.) V.S. identified her vagina on the clip, along with Petitioner's voice on the video saying "pull it in and out." (RT 1328.) V.S. said she buried the videotapes in her backyard in 1995 when Petitioner was convicted of molesting her sister E.S., and showed the police in 2011 where they were buried. (RT 1322-27.)

V.S. was living alone in Los Angeles when Petitioner was released from prison in 2000, and he came to see her on the day he was released. (RT 1329.) She told him she wanted to have a relationship but did not want to resume their sexual relationship. (RT 1329-30.) He tried to talk her into continuing their sexual relationship, and "was pretty adamant about it," but they never had sex again. (RT 1330-31.) In 2011, she told him she was upset about how he had treated her and that it had interfered with her relationship with her husband, but Petitioner blamed her for telling her husband, and told her it had been a consenting sexual relationship. (RT 1339-40.) When she asked him why he did what he did, he said he loved her and did not know of any other way of showing her. (RT 1242.)

In the fall of 2011, V.S. became aware that Petitioner was charged with molesting her sisters I.S. and K.S., and she wrote a letter to a judge on October 12, 2011, detailing Petitioner's sexual abuse of herself in order to assist the case against him and because she did not want to participate or testify in the case. (RT 1342-44, 1352.) She said that at first she agreed to write the letter at E.S.'s request to assist E.S. in a dispute she was having with Petitioner over cable and telephone bills, but actually wrote the letter to help her sisters I.S. and K.S. (RT 1343, 1354.) She also kept a therapy journal in March 2010 which she turned over to the prosecution a few days before she testified, in which she wrote that

17cv0023-LAB(MSB)

Petitioner wanted to marry her and did not want her to have a boyfriend until she was 18. (RT 1375, 1391-95, 1412-13.)  She was contacted on November 28, 2011, by Detective Burow regarding her letter, and told him Petitioner had molested her in 1998 when she was 13.  (RT 1344.)  V.S. said she was watching an Oprah show in 2005 when she first realized the molestation was not her fault, and called the police at that time and said it was possible Petitioner would molest her sisters, but they told her they could not help because she had no specific allegations and she did not know where he was at that time.  (RT 1333, 1345, 1350.)  She clarified that she made an anonymous call to Child Protective Services on November 15, 2005, not the police, but did not at that time give specific allegations about Petitioner, just a generic report she had been molested as a child and was concerned his children were at risk, and the first time she provided specific allegations to law enforcement that he molested her was on November 28, 2011.  (RT 1344-46, 1398-1405.)

On cross-examination, V.S. said that when she testified falsely at Petitioner's 1995 trial that he had not molested her, she did so not just because she had no place to go if he was convicted, but because she honestly believed at that time he had not molested E.S. (RT 1379.)  V.S. said she believed at that time that Petitioner had not molested E.S. based on something someone told her, but was not allowed to testify who told her what.  (RT 1418-19.)  The trial judge rejected defense counsel's argument that V.S.'s testimony opened the door to evidence that E.S. had recanted.  (RT 1423-25.)  As discussed in claim one, prior to trial and several times throughout trial, defense counsel sought to introduce evidence challenging the 1995 conviction, including testimony of a City Attorney, a Child Protective Services worker, and V.S., that E.S. had told them she fabricated her allegations against Petitioner because her grandmother, Margo Yankey, threatened to beat her if she did not say he molested her, and to introduce evidence that Yankey wished to retain custody of E.S. in order to continue receiving child support from Petitioner and money from the government.  During a hearing on the prosecution's pretrial motion to introduce the fact of the 1995 conviction, defense counsel argued it would open the door to a challenge to the 1995 conviction which would result in two weeks of extra testimony, involving not just the

17cv0023-LAB(MSB)

evidence presented at the 1995 trial, but post-trial evidence challenging E.S.'s credibility, including that Petitioner and E.S. had physical alterations, that Yankey had filed an elder abuse report against E.S., and that Petitioner had sued E.S. in small claims court over a phone bill. (RT 10-12.) The judge repeatedly ruled the evidence was irrelevant because it would not change the fact of the prior conviction, and because relitigating or reopening the 1995 conviction would consume too much time. (RT 13-16, 623-34, 1425.)

Mahogany Storey testified that Petitioner is her uncle and she lived in Lemon Grove with him and V.S. for six or seven months in the fall of 1992 when Mahogany was 16 and 17. (RT 1426-28.) V.S. was a year older than Mahogany, and they went to the same high school. (RT 1427-28.) Mahogany and V.S. shared a bedroom, but V.S. slept with Petitioner in his bed most nights. (RT 1428.) V.S. often walked around the apartment wearing only panties, even when Petitioner was there. (RT 1428-29.) Mahogany said she often spoke to V.S. about her nudity around the house, but V.S. said no one should be ashamed of their body. (RT 1429.) When Mahogany went into Petitioner's bedroom one morning she saw motion under the covers in the bed which looked like Petitioner and V.S. having sex. (RT 1430-32.) When she asked V.S. later that day about the incident, she denied having sex with Petitioner. (RT 1432.) Petitioner entered Mahogany's bedroom the next morning, got in bed with her and asked her to have sex for money. (RT 1432-33.) She told him no, pushed him away, and asked him to leave her room, but he stayed and continued talking. (RT 1434.) She moved out that evening and told V.S. about the incident, but said V.S. "was in denial basically." (RT 1434-35.)

Dr. Timothy Fairbanks, a pediatric surgeon at Rady Children's Hospital, testified that on August 16, 2011, a 6 year old child named I.S. was admitted to the emergency room because a rock had been inserted into her vagina. (RT 1703-04.) The emergency room staff was unable to remove it, and they called Dr. Fairbanks. (RT 1704.) He sedated I.S., removed a smoothed rock in the shape of a heart with his hand, and observed no injury or damage to her vagina or hymen, and no preexisting injuries. (RT 1707-08.) Dr. Fairbanks did not notify law enforcement about possible abuse, as he found plausible I.S.'s statement

that she inserted the rock herself, but said social workers were present and their protocol may have required Child Protective Services to be notified. (RT 1720-21.) He met with Dr. Joyce Adams and Detective Burow on March 20, 2012, viewed images of I.S.'s hymen taken by Dr. Adams on November 24, 2011, and identified injuries to her hymen and a genital wart which were not present on August 16, 2011. (RT 1709.)

Dr. Joyce Adams, a pediatrician and professor of pediatrics at UCSD School of Medicine, testified that on October 24, 2011, she examined a child named K.S., who was in a wheelchair due to arthrogryposis. (RT 1749-50.) The examination revealed a normal hymen and no sexually transmitted diseases. (RT 1752.) Dr. Adams also examined K.S.'s sister I.S. on October 24, 2011, and observed a torn hymen which appeared to have healed, and a genital wart, both consistent with sexual abuse. (RT 1752-61, 1769-72.)

I.S. testified that she would soon be nine years old, is in the third grade, has a sister named K.S., and Petitioner is their father. (RT 1873-77.) She testified that Petitioner had touched her vagina with his penis more than once. (RT 1833-86.) It happened when she slept with her mom and dad in their bed while her mom was asleep and all three of them were naked, and sometimes when her mom went to the bank or the store. (RT 1887-90.) She said that although her sister K.S. wore pajamas to bed, she, Petitioner and her mother always slept naked. (RT 1888-89.) She said it hurt when Petitioner touched his penis to her vagina and she told him to stop, but he told her not to tell anyone, including her mom, or she would go to a foster mom. (RT 1891.) She was afraid that if she told anyone she would go to a foster mom or be whipped with a belt by Petitioner, as he often did when she wet her bed. (RT 1891-93.) I.S. said she put the heart shaped rock inside her private part herself when she was alone but did not know why. (RT 1894.)

K.S. testified that she would be seven years old in two weeks, is in second grade, has a sister named I.S., and Petitioner is their father. (RT 1825-29.) She said Petitioner has never touched her private part, and said she told the truth when she spoke to Laurie Fortin, a forensic examiner, but denied she told Fortin that Petitioner had touched her vagina and peed on her vagina. (RT 1844-49.)

17cv0023-LAB(MSB)

Laurie Fortin, the Clinical Coordinator of the Forensic and Medical Program at the Chadwick Center at Rady Children's Hospital, testified that she conducted a forensic interview with K.S. on October 25, 2011, when she had just turned five years old. (RT 2311-12.) A videotape of the interview was played for the jury and a transcript is in the record. (RT 2314; CT 309-56.) K.S. said during the interview that Petitioner often touched her buttocks and urinated on her private part. (CT 333-38.) Dr. Fortin interviewed I.S. on four occasions, which were videotaped but not shown to the jury by the prosecution. (RT 2316-17.) Transcripts are in the record. (CT 357-466.) Fortin said I.S. did not report any touching during the first two interviews, and when asked if she would tell the truth during the third and fourth interviews I.S. said she did not want to discuss the topic and would not tell the truth. (RT 2318-24.)

Canesha Storey testified that her husband Petitioner is sixty-one years old. (RT 2379-80.) They married in 2006 and have two children together, K.S., who was born with a congenital disease which causes her to use a wheelchair, and I.S. (RT 2380-81.) Petitioner's child from another marriage, E.S., lived with them for a short time in 2010 or 2011. (RT 2381-83.) Canesha, Petitioner, K.S. and I.S. were living together in a three-bedroom apartment; the two girls shared a bedroom with separate beds, and Petitioner and Canesha slept in separate bedrooms because Petitioner "wanted his own space." (RT 2386-88.) She said all of them always wore pajamas to bed, tops and bottoms, including Petitioner. (RT 2390.)

On August 16, 2011, about 1:00 a.m., I.S. came into Canesha's bedroom and said she had put a heart-shaped rock in her vagina, and Petitioner told Canesha to take her to the hospital. (RT 2395-96.) Canesha called her sister Marena who drove them to the hospital where the rock was removed, and Canesha did not observe any injury to I.S. (RT 2400-01.) Petitioner was taken to jail that day and never came back to the apartment. (RT 2406.) He was released and lived at the Black Contractor's Association until he was arrested again on April 5, 2012. (RT 2410.) When confronted with a representation that jail phone records showed Canesha spoke to Petitioner at least 72 times after his arrest, she

admitted she testified falsely at the preliminary hearing that she had not been in contact with him since his arrest because she wanted to help him. (RT 2428-31.) During the jail conversations, Petitioner said it was "cool" that she had testified at the preliminary hearing that the girls always wore pajamas to bed, and later scolded her, saying the girls had told the authorities nothing and "everything was great until" Canesha became involved. (RT 2432-34.)

Marena Hinton, Canesha's sister, testified that a couple of weeks after the incident with I.S. and the heart-shaped rock, I.S. told Marena "my daddy did it," referring to placing the rock in her vagina. (RT 2553-57.) I.S. asked to stay with Marena at her house, and told her: "My daddy comes in the daytime and the nighttime sometimes. I'm scared, I'm nervous," and asked Marena to: "Stay in my room with me at nighttime, because my dad comes in at nighttime." (RT 2558-59.) Once when Marena took I.S. to the bathroom, I.S. told her that Petitioner "touches me," and "put tape on my mouth and rubbed my leg." (RT 2563.) I.S. continued saying those types of things, and when Marena spoke about it to her own caseworker, the caseworker said it had to be reported to Child Protective Services. (RT 2560.) When Marena finally told Canesha what I.S. said, Canesha was angry, denied anything had happened, and "blamed me for everything." (RT 2570.) Nearly every time she visited the apartment the girls were naked, and she finally contacted Child Protective Services on August 29, 2011. (RT 2560-61, 2574.)

Dr. Catherine McLennan, the Supervisor in the Forensic Heath Department of Palomar Hospital, testified regarding the training, purpose and protocol of interviewing children suspected of being sexually abused, and said the majority of children will wait a significant period of time to report molestation, most never tell anyone, they often falsely deny abuse because they feel ashamed and embarrassed, or believe they will be in trouble or will cause a person they love to go to jail, and children without a supportive mother are less likely to disclose abuse. (RT 2603-32.)

Abdur-Rahim Hameed, the president of the Black Contractor's Association, testified it is a trade association and their building has offices for rent which are not intended as

17cv0023-LAB(MSB)

living spaces. (RT 2464-65.) Near the end of 2011, Petitioner was working on a job for the Association, and Hameed allowed him to live there in a storage unit until he was arrested in April 2012. (RT 2466-69.) Melvyn Lofftus, a San Diego Police Detective assigned to the Sexual Assault Felony Enforcement task force which confirms registration information on sex offenders, testified that Petitioner moved from his residence where he had been living with his wife and children to the Black Contractor's Association building, but did not register that change of address. (RT 2687-2704.)

Daniel Burow, a San Diego Police Detective, testified that K.S. and I.S. were taken into protective custody on October 19, 2011, and he was assigned to the case the next day. (RT 2714.) He scheduled physical examinations for the girls for October 24, 2011, and forensic interviews the next day. (Id.) Laurie Fortin conducted the interviews while Detective Burow observed. (Id.) He interviewed Petitioner's adult daughter V.S. on November 28, 2011, who reported several years of sexual abuse by Petitioner, including regular oral copulation when she was 13, and that she had orally copulated him once. (RT 2715-16.) V.S. told Detective Burow this was the first time she reported the abuse to the police, and he verified through police records that there was no record of her having previously made a report to law enforcement. (RT 2716-17.) He testified that at the preliminary hearing K.S. at first denied Petitioner had touched her, but then said he had touched her vagina with his hand in her bed under her underwear. (RT 2721-25.) He said I.S. testified at the preliminary hearing that Petitioner touched her vagina with his hand and penis more than once, that "he lays on top of her," and that she put the heart-shaped rock in her vagina herself and denied telling her aunt Marena Petitioner had done so. (RT 2725-27.) Detective Burow dug up videotapes from the back yard of Petitioner's house where V.S. showed him they were buried. (RT 2728-36.) The parties stipulated that Petitioner's medical records do not show he has genital warts, and the People rested. (RT 2778-81.)

The defense began by playing of the videotapes of I.S.'s four forensic interviews. (RT 2777-80.) Anthony Giralamo, a District Attorney investigator, testified that he and the prosecutor met with V.S. in their office. (RT 2801-03.) V.S. told them she had not

testified against Petitioner in 1995 because she was ashamed for allowing the abuse to go on for so long, considered herself guilty, and that it took her a long time to realize she was a victim. (RT 2803-04, 2815.) When confronted with the fact that she had testified in 1995, V.S. told them she did not remember testifying. (RT 2805-06.) V.S. was cooperative and appeared to want to participate in the investigation, but did not inform them at that time she had buried the videotapes or kept a diary. (RT 2806-08.) His notes indicted that V.S. said she wrote the letter to the court about her abuse because E.S. asked her to as E.S. was having a dispute with Petitioner over a phone bill. (RT 2813.)

Dr. Joanna Edwards, a clinical and forensic psychologist, testified that children with developmental disabilities or delays who are raised in a dysfunctional environment such as K.S. and I.S. are more likely to adopt another person's version of events as their own. (RT 2820-50.) She said that I.S.'s forensic interviews showed such developmental delays, along with a mixed expressive receptive communication disorder, which, in addition to the number of interviews and repeated questioning after she initially denied abuse, raised concerns regarding the reliability of her later answers to the contrary. (RT 2851-2942.)

Peggy Ceballos-Lopez, a social worker assigned to investigate child abuse, testified that she met with K.S. and I.S. after I.S. was treated at the hospital for a rock in her vagina. (RT 2981-83.) I.S. told Lopez she put the rock in her vagina herself, and both I.S. and K.S. denied Petitioner ever inappropriately touched them. (RT 2999-3002.) She received a call from Marena Hinton on October 7, 2011, who said I.S.'s mother told her that I.S. had been seen at the hospital with a rock stuck in her rectum, not her vagina, and that I.S. had never made any allegations to Hinton of sexual abuse by Petitioner. (RT 3002-03.)

Prior to Petitioner taking the stand, the judge once again denied defense counsel's renewed request to introduce evidence E.S. had recanted her allegations on which the 1995 conviction was based, although Petitioner was allowed to deny guilt, accuse E.S. of lying, and argue that her living with him after he got out of prison for that conviction was evidence she had not been molested. (RT 2952-66.) Petitioner testified that he was 20 years old when he married Veronica Morris, and nine months later they had a child named V.S. (RT

17cv0023-LAB(MSB)

3024.) Veronica left with V.S. six months later and Petitioner did not see V.S. again until she was 11. (RT 3025, 3027.) He was in a good relationship with Esther Singleton when V.S. moved in with them, but Esther was smoking crack cocaine at the time, even while pregnant with E.S., and tension arose because Esther's son Devon and V.S. came to Petitioner for support, including things a mother would ordinarily do, rather than Esther, who was unreliable. (RT 3031-36, 3138.) As to Esther's testimony about his kneeling next to V.S.'s bed one night, Petitioner explained that he had been standing and talking to Devon in the top bunk when V.S. said something he did not hear, and had just kneeled down to V.S.'s bunk when Esther entered the room. (RT 3036.) Petitioner ended his relationship with Esther and obtained custody of E.S. in order to protect V.S. and E.S. because of Esther's drug use. (RT 3038-39.) They divorced at that time but had another child together about a year later, and although Petitioner has thirteen children, he maintained contact only with E.S., V.S., I.S. and K.S. (RT 3040-41, 3125.)

Petitioner said he moved in with his mother in San Diego with V.S. and E.S. in 1989 because he needed help raising them. (RT 3047-49.) He began his relationship with Karen Spearman shortly thereafter, and the four of them lived in a two-bedroom, one bathroom apartment. (RT 3050-51.) The incident in the bathroom described by Spearman where he walked in on V.S. showering was an innocent incident caused by four people sharing one bathroom, as was V.S. occasionally walking around in her panties. (Id.) He denied Spearman left because of the situation in the apartment, and denied Mahogany ever found him having sex with V.S. in his bedroom. (RT 3051-56.) He said V.S. occasionally slept with him in his bed, but usually after Mahogany kicked her out of their shared bed. (RT 3056, 3058.) He and Freddy Arch had a falling out over his refusal to pay Arch for poorly performed work. (RT 3060-61.)

Petitioner said that in late 1993 or early 1994 he was accused of molesting E.S., and although he denied doing so, admitted he was convicted in 1995. (RT 3067-69.) Starting in 1990, he videotaped himself using sex toys on himself, and during the 1995 prosecution he did not want to have anything of a sexual nature found in his home so he buried the

videotapes in his backyard where V.S. showed the police to dig, and she might have seen him bury them. (RT 3071-75.) He did not recognize who was in the video clip shown to the jury in which V.S. identified her vagina, and said he never videotaped himself with women, but once caught V.S. and her husband, who was her boyfriend at the time, using the equipment. (RT 3075, 3131.) He did not notify the sex offender registry of a new address when he moved out of his apartment in 2011, because, although he had a restraining order preventing him from going there, he still paid the rent and all the bills. (RT 3081-82.) He denied ever inappropriately touching E.S., K.S., I.S. or V.S., said he was not home when I.S. put the rock in her vagina, denied telling Canesha to lie and say everyone slept in pajamas rather than in the nude, denied giving V.S. alcohol or marijuana before she was eighteen years old, and said he and V.S. only occasionally walked around in their underwear in front of each other. (RT 3103-07, 3116-17, 3200.) He never walked around the apartment nude, and took no notice of V.S. when she walked around in just her bra and panties because Esther walked around that way. (RT 3126.) The defense rested and there was no rebuttal evidence. (RT 3218.)

During deliberations the jury viewed the video clip of the vagina and the videotape of K.S.'s forensic interview, had the testimony of V.S., K.S., I.S. and Dr. McLennan read back to them, and asked for, but were denied, a read back of closing arguments. (CT 190-97, 594-600.) After four days, they deadlocked 11 to 1 in favor of guilt on the charges involving K.S. (counts 1-4), and a mistrial was declared on those counts. (CT 601; RT 3355.) The jury found Petitioner guilty of nineteen counts of committing a lewd act upon a child under the age of fourteen, two involving I.S. (counts 5-6) and seventeen involving V.S. (counts 7-22), and two counts of failure to register as a sex offender (counts 23-24). (RT 3341-49.) They found he had substantial sexual contact with I.S., committed the offenses against more than one victim, had been convicted in 1995 of committing a lewd act on E.S., and that the charges involving V.S. were filed within one year of her reporting them to the police. (CT 259-79.) He admitted the truth of his 1995 conviction, and was sentenced to 185-years to life plus 40 years in state prison. (CT 626-30; RT 3352.)

# III.   PETITIONER'S CLAIMS

(1)  Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments to present a defense, to compulsory process, to cross-examination and to due process were violated by the introduction of evidence of his 1995 conviction for molesting E.S. as propensity evidence without allowing him to introduce evidence E.S. had recanted her allegations. (ECF No. 1 at 6, 32-43.)

(2)  Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments to due process and to present a complete defense were violated by instructing the jury they could not consider for their truth statements I.S. made during her forensic interview in which she denied being molested, but only to evaluate the expert opinion of Dr. Edwards regarding whether and to what extent child abuse victims tell the truth.  (Id. at 6, 44-50.)

(3)  Petitioner's Fourteenth Amendment right to have every element of an offense proven beyond a reasonable doubt was violated because the jury was erroneously instructed that the triggering date of the one-year statute of limitations was November 28, 2011, when V.S. reported the molestation to Detective Burow, whereas her testimony was ambiguous whether she informed Child Protective Services or the police in 2005.  (Id. at 6, 51-56.)

(4)  Petitioner's Fourteenth Amendment right to due process was violated by the prejudicial cumulative effect of the errors alleged in claims 1-3.  (Id. at 6, 58.)

(5)  Petitioner's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was denied by his trial counsel's failure to conduct an adequate investigation, and to discuss the discovery with him and settle on a trial strategy, which resulted in counsel's failure to: (a) present evidence that I.S. denied abuse for nine months through twenty-two therapy sessions and was coerced by the prosecutor to testify against him; (b) object to allowing the jury to hear about his prior conviction during voir dire which stereotyped him as a child molester; (c) object that he was not properly or timely arraigned; (d) present evidence that the initial allegations of molestation were reported by E.S., not by Dr. Fairbanks or Peggy Lopez as represented by the prosecutor, and seek dismissal of the charges on the basis that E.S. admitted prior to the preliminary hearing she had no

knowledge of any molestation; (e) object to the trial court reversing its pre-trial ruling excluding evidence of the heart-shaped rock in I.S.'s vagina; (f) present the victims' school records and statements from their teachers and staff showing they did not exhibit signs of molestation at school; (g) present evidence that the triggering date for the statute of limitations as to the counts involving V.S. arose when she disclosed her allegations in detail to her therapist in 2005; (h) present evidence that V.S. did not make her allegations until she joined a "cult church" in 2005; (i) present evidence that V.S. was not the person who made the 2005 anonymous call to Child Protective Services as the prosecutor represented; (j) present evidence that V.S. is not the person shown in the video clip of the vagina; (k) argue there was no evidence to support V.S.' preliminary hearing testimony that she was impregnated five times by Petitioner resulting in one abortion and four miscarriages; (l) show that V.S. was unable to describe the unusual anatomy of his erect penis; (m) show that he never lived in a mountainous area of Los Angeles as testified to by V.S.; (n) show that he could not have molested V.S. while her boyfriend was in the apartment as testified to by V.S. because it was a studio apartment; (o) impeach V.S. more fully with her testimony from his 1995 trial; (p) properly advise him regarding testifying on his own behalf; and (q) object to the prosecutor's excessive use of leading questions to V.S. (ECF No. 48 at 6-54.) He claims prosecutorial and judicial misconduct from: (a) excessive use of leading questions to V.S.; (b) the prosecutor's false identification of V.S. as the anonymous caller to Child Protective Services in 2005; (c) introduction of the improperly authenticated video clip of the vagina; (d) allowing V.S. to falsely testify she had sex with Petitioner while her boyfriend was in their apartment; and (e) informing the jury during voir dire of his prior conviction. (Id. at 35-38, 46, 51-56.) Finally, he alleges his appellate counsel was ineffective for failing to raise all those claims on appeal. (Id. at 6-56.)

The Court has cited to the original Petition, (ECF No. 1), and the First Amended Petition, (ECF No. 48), as the source of Petitioner's claims. The original Petition contains claims one through four just as they were raised on direct appeal, (ECF No. 1 at 6, 32-58), as well as the claims of ineffective assistance of trial counsel and judicial and prosecutorial

misconduct presented in claim five, (id. at 7-10, Ex. F), along with a request to stay this action and hold the Petition in abeyance while Petitioner returned to state court to present claim five in a habeas petition.[2]  The First Amended Petition contains claim five, (ECF No. 48 at 6-56), but does not repeat the first four claims.  Rather, it incorporates them by reference to the original Petition.  (Id. at 6.)  Although an amended petition supersedes an original petition resulting in the abandonment of any claims not re-raised in the amended petition, King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), Petitioner has treated his original Petition as an opening brief, (see ECF No. 48 at 6), and Respondent has correctly recognized, (see Ans. Mem. at 2), that by incorporating the original Petition by reference in the First Amended Petition, all claims are presented in the First Amended Petition.  See Dye v. Hofbauer, 546 U.S. 1, 4 (2005) (holding that a habeas claim was properly presented where "[t]he habeas petition made clear and repeated references to an appended supporting brief, which presented his federal claim with more than sufficient particularity."); Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987) (quoting Boag v. MacDougall, 454 U.S. 364, 365 (1982)) ("The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants."); Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001) (holding that liberal construction of pro se prisoner habeas petitions is especially important with regard to which claims are presented).

## IV.   DISCUSSION

The Court finds that habeas relief is unavailable as to the first three claims because the state court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  In addition, even if Petitioner could make that threshold showing, those alleged errors are harmless.  The Court

---

[2]  Exhibit F to the original Petition, which lists the ineffective assistance of trial counsel and the judicial and prosecutorial misconduct claims, was removed from the original Petition and filed separately as a Motion for Stay and Abeyance.  (ECF No. 3.)  That motion was eventually denied as moot because Petitioner exhausted those claims in his first state habeas petition which the state court denied prior to this Court ruling on his stay and abeyance motion.  (ECF No. 33.)

17cv0023-LAB(MSB)

finds claim four is procedurally defaulted as a result of the failure to present it to the state supreme court, but it also fails on the merits under a de novo review. Finally, claim five is subject to procedural bars in this Court, but judicial economy counsels in favor of denying it on the merits irrespective of any procedural bars because it clearly fails under a de novo review. Accordingly, the Court recommends the First Amended Petition be denied.

## A. Standard of Review

In order to obtain federal habeas relief with respect to claims adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. In order to satisfy § 2254(d)(2), the factual findings upon which the state court's adjudication of Petitioner's claims rest must be objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A claim which has not been adjudicated on the merits in state court is reviewed de novo. Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under such a review,

"state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). Where the reasoning of the state court is relevant, it must be part of a federal habeas court's consideration under de novo review. Frantz, 533 F.3d at 738.

## B. Claim One

Petitioner alleges in claim one, as he did in state court on direct appeal, that his rights under the Fifth, Sixth and Fourteenth Amendments to present a defense, to compulsory process, to cross-examination, and to due process were violated by the introduction of evidence of his 1995 conviction for molesting E.S. to show he had a propensity to commit the current offenses, without allowing him to present evidence that E.S. had recanted. (ECF No. 1 at 33-43.) The defense challenged the prior conviction in several ways, including Petitioner's testimony he was innocent, his argument that E.S. would not have moved back in with him after he was released from prison for molesting her unless he had not done so, V.S.'s testimony that the first time she came forward with her allegations against Petitioner was at E.S.'s behest because E.S. was having a dispute with Petitioner over bills, and V.S.'s testimony that when she testified in 1995 she honestly believed Petitioner had not molested E.S., which the defense attempted to argue was due to V.S. being aware E.S. recanted. The defense was precluded from calling a City Attorney, a Child Protective Services worker, and V.S., to testify that E.S. told them that she did not remember being molested and her grandmother, Margo Yankey, beat her and forced her to testify falsely that Petitioner had molested her, to introduce evidence that Yankey wished to retain custody of E.S. in order to continue receiving child support from Petitioner and money from the government, and to ask the expert witnesses about E.S.'s credibility in light of her recantation. (RT 13-16, 612-31.) He argues here that the exclusion of that evidence was prejudicial because: (a) this was a close case, as the jury deliberated four days, asked for numerous read backs and could not reach a verdict on K.S., (b) V.S. testified

in 1995 that Petitioner had not molested her, and did not come forward with her allegations until 2005 or 2011, and (c) I.S. previously repeatedly denied abuse until the preliminary hearing, and did not report abuse to law enforcement, Child Protective Services, or during her four forensic interviews. (ECF No. 1 at 42-43.)

Respondent answers that Petitioner has failed to show that the denial of this claim by the state court on direct appeal amounted to an unreasonable application of controlling United States Supreme Court authority, which provides that exclusion of evidence in a state criminal trial rises to the level of a denial of a federal constitutional right to present a complete defense only where the evidence is sufficiently reliable and critical to the defense. (Ans. Mem. at 16-24.) Respondent argues Petitioner was not prevented from presenting a complete defense because he was in fact able to challenge the prior conviction, and because the excluded evidence was only relevant to an ancillary issue of propensity. (Id. at 24.)

Petitioner presented this claim to the state supreme court in a petition for review. (Lodgment No. 6.) The petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 7.) It was presented to the appellate court on direct appeal (Lodgment No. 3), and denied in a written opinion (Lodgment No. 5).

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The appellate court opinion, the last reasoned state court decision as to this claim, states:

> The trial court allowed the prosecutor to admit defendant's 1995 convictions for sexually abusing E.S. as propensity evidence under Evidence Code section 1108, subdivision (a). [Footnote: Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by (Evidence Code) Section 1101, if the evidence is not inadmissible pursuant to (Evidence Code) Section 352."] Defendant sought to rebut this evidence with "evidence and testimony through CPS, a city attorney and (V.S.) that (E.S.) (subsequently) told them she was not molested and her grandmother planted and suggested the accusations of molest." The trial court barred defendant's evidence. Defendant concedes his prior conviction was properly admitted as

propensity evidence, but contends the trial court's exclusion of his rebuttal evidence violated his Fifth, Sixth, and Fourteenth Amendment rights to compulsory process, cross-examination, and due process. We are not persuaded.

A.   *Proceedings Below*

Before trial, the prosecutor identified certain propensity evidence she intended to introduce at trial. That evidence included defendant's 1995 convictions for sexually abusing E.S. The prosecutor explained that as a matter of efficiency, she planned to introduce just the certified convictions without any live testimony from witnesses about the circumstances of the convictions.

Defense counsel opposed this approach. She acknowledged "the certified records of conviction would certainly show (E.S.) was molested," but argued E.S. later admitted to others she was coerced into falsely saying defendant had sexually abused her. Therefore, defense counsel argued that if the convictions were admitted, she should be able to "impeach" them. However, because she could not locate E.S., she indicated she would impeach the conviction with the testimony of those to whom E.S. supposedly recanted, even though counsel acknowledged "(i)t's not quite proper with me attacking the conviction with hearsay . . . ." Defense counsel acknowledged her approach would require "a trial within a trial" that would consume "at least" two weeks of trial time.

The trial court ruled the convictions were admissible and found that defendant's purported impeachment evidence was irrelevant because it would not change the fact of the fully litigated convictions. The trial court further excluded defendant's evidence as unduly time-consuming under Evidence Code section 352. [Footnote: Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."] Nevertheless, if defendant were to testify at trial, the trial court would allow him to deny that he sexually abused E.S. and to claim that she was lying about having been sexually abused.

Defendant later renewed his request to attack the convictions with hearsay testimony that E.S. denied she was sexually abused. The trial court confirmed its prior ruling, declining to "hav(e) a little mini Jerry Springer

Show" that explored the family dynamics that might have led E.S. to tell different versions of her story to different people at different times. The court clarified it would allow defendant to also oppose the propensity evidence with testimony of "somebody of a similar age" of his victims who would state "I was with him during whatever the time period is, and he didn't try to molest me."

The impeachment issue arose during trial. On cross-examination, defense counsel asked V.S. why, during defendant's prosecution for sexually abusing E.S., V.S. supposedly lied by denying defendant had sexually abused her. The following exchange occurred:

"A. I really did not believe he molested my sister."

"Q. You never saw anything that led you to believe that he did?"

"A. No. And I did not want him to get in trouble for molesting my sister because I did—really I did not believe he molested her."

V.S. then testified that she, E.S., and defendant "would hang out together" after defendant was released from prison.

On recross-examination, defense counsel tried to explore V.S.'s basis for believing defendant's claim he had not sexually abused E.S.

"Q. Counsel asked you whether or not my client said things to you about (E.S.), and you believed them."

"A. During the time of the trial, about what was going on for the molestation of (E.S.), yes. I believed him."

"Q. And there are statements that (E.S.) made to you also that were consistent with what my client told you, correct?"

"(Prosecutor): Objection, hearsay."

"The Court: Sustained."

"(Defense counsel): There were reasons for you to believe what my client said relating to (E.S.), true?"

"A. During the trial of him molesting her?"

"Q. During and after."

"(Prosecutor): Objection, speculation, relevance."

"The Court: Sustained."

"(Defense counsel): You mentioned that there were statements that caused you—that my client made that you believed regarding the molestation of (E.S.), correct?"

"A. Yes."

"Q. There were other reasons for you to believe what he had said to you, true?"

"A. Yes."

"Q. Those reasons came from (E.S.); isn't that true?"

"(Prosecutor): Objection, speculation."

"The Court: Sustained."

"(Defense counsel): Your honor, may we go sidebar?

"The Court: No. Ask another question."

"(Defense counsel): There were reasons outside of what my client told you that caused you to believe him; isn't that correct?"

"A. During the case of the molestation of (E.S.), yes."

"Q. And after, correct?"

"A. And that—be specific of after."

"Q. After he—well, we will say while he was in prison and after he got out of prison there were things that were said to you that caused you to continue to believe what my client had told you, correct?"

"(Prosecutor): Objection, hearsay."

"(Defense counsel): I'm not asking for what was said."

"The Court: Overruled. Her state of mind. Yes or no, after he got out of prison?"

"The witness: He got out of prison for a period of time, yes."

"The Court: Okay. Ask another question.

"(Defense counsel): And those things that you heard did not come from my client. They came from other people, correct?"

"(Prosecutor): Objection, hearsay, speculation."

"The Court: Sustained. (¶) Ask another question."

"(Defense Counsel): It came from—"

"The Court: Let's go on—you can't ask that question, so let's go on to another topic, please."

"(Defense counsel): I have nothing further."

Defense counsel argued that V.S.'s testimony had opened the door for her to ask about E.S.'s hearsay statements. The trial court disagreed and reaffirmed its earlier ruling.

Before defendant took the witness stand, his counsel again raised the impeachment issue. The trial court reaffirmed its ruling under Evidence Code section 352, but reiterated that defendant could deny that he sexually abused E.S. and clarified that defendant could also argue E.S. would not have lived with him again (as she did) had defendant truly sexually abused her.

Defendant testified he did not molest E.S. or his other daughters. When defendant's counsel asked him the circumstances under which E.S. came back into his life after he served his prison sentence for sexually abusing her, defendant responded, "(E.S.) confessed to me that she knew I had not—" The trial court sustained the prosecutor's hearsay objection. When defendant's counsel asked him why he let E.S. move in with him, he responded, "Because she had—because she had confessed that she knew I didn't —" The trial court again sustained the prosecutor's hearsay objection.

During closing argument, defense counsel argued V.S. knew defendant had not sexually abused E.S. and would not have allowed her to live near defendant if he had. Counsel elaborated:

> "When (V.S.) was on the stand, ladies and gentlemen, it was very interesting to watch. She was asked questions whether or not my client had said something to her that caused her to believe him. She answered yes. And then I started asking her questions whether or not there was anything else, anything independent that caused her to believe him. There's a flurry of objections. But it comes out. There was something independent that caused her to believe him.["]

> "And what was that one thing? Couldn't go there. The one thing independent was the fact that (E.S.), after she was 13 years old and her mother had abused her—her grandmother had abused her for so long and she ran away from home, she came to him and she confessed to him exactly what had happened, that her grandmother had forced her to say that he abused her for financial gain."

> "(Prosecutor): Objection."

> "The Court: Sustained."

> "(Prosecutor): Motion to strike that entire argument."

> "The Court: Right. Strike that."

> "(Prosecutor): No evidence of that."

> "The Court: Disregard that."

> "(Defense counsel): A reasonable interpretation as to why (V.S.) and (E.S.) came back into his life, because he didn't do it."

Later, during closing argument, defense counsel argued, without objection, "Why would this man bring in his daughter that he molested, who actually sent him to prison in 1995, into his home if he was molesting his children? . . . A reasonable interpretation as to why he would let (E.S.) come back into his home is because she confessed to him nothing happened and he said, I forgive you."

29

## B. *Relevant Law*

Evidence Code section 1108 sets forth an exception to the general rule against the use of evidence of a defendant's misconduct apart from the charged offense to show a propensity to commit crimes. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 989–990.) When a defendant is charged with a sex offense, Evidence Code section 1108 allows admission of evidence of other sex offenses to prove the defendant's disposition to commit sex offenses, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352. (Evid. Code, § 1108, subd. (a); *Robertson*, at p. 990.) Evidence Code section 1108 is premised on the recognition that sex offense propensity evidence is critical in sex offense cases "'given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 918.)

Under Evidence Code section 1108, the prosecution must prove only by a preponderance of the evidence that the defendant committed a prior sexual offense. (*People v. Lopez* (2007) 156 Cal.App.4th 1291, 1299.) Court records of the defendant's prior conviction for a sex offense "may be offered to prove not only the fact of a conviction, but the commission of the underlying offense." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1461; see *People v. Wesson* (2006) 138 Cal.App.4th 959, 967–968; Evid. Code, § 452.5, subd. (b)(1) ("An official record of conviction . . . is admissible . . . to prove the commission . . . of a criminal offense. . . .").)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Id.* at pp. 1124–1125.)

"(A) state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon" a defendant's "general right to offer a defense through the testimony of his or her witnesses." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 ("Although completely excluding evidence of an accused's defense theoretically could rise to (the level of impermissibly infringing on a defendant's right to present a defense),

excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.").)

## C. *Analysis*

The trial court did not abuse its discretion by excluding defendant's rebuttal evidence as unduly time-consuming under Evidence Code section 352. Defense counsel conceded her impeachment approach would result in not only one tremendous "trial within a trial" - "(a)t least" two weeks "just on (E.S.)" - but would actually result in *two*: "rehashing the entire trial, *plus* what happened after." (Italics added.)

The prosecution agreed that if defendant sought to impeach E.S.'s 1995 trial testimony, the prosecution would be forced to retry the entire case by presenting all the evidence in addition to E.S.'s trial testimony. [Footnote: The prosecutor argued: "(I)f the jury is left to believe that (E.S.) was the reason for that prior conviction, the jury will need to learn that there was much more behind that conviction. There were her spontaneous disclosures, there was her forensic interview when she was (four) years old giving the details, there were her physical findings. All of that evidence would then need to be presented to the jury. This will turn into a trial within a trial within a trial, which . . . is just going to be confusing."] Defense counsel acknowledged the 1995 trial was "voluminous" and lasted "probably about a week and a half."

Defense counsel and the prosecutor agreed the second mini-trial - addressing E.S.'s supposed subsequent recantations and the circumstances surrounding them - would also be extensive. Defense counsel stated, "I would have a list of witnesses that would come in to impeach (E.S.) or impeach whatever in that trial. You're looking at two weeks just on (E.S.). At least." She elaborated that the "can of worms that is being opened" would contain a lawsuit that defendant filed against E.S. over an unpaid phone bill and an elder abuse complaint E.S.'s grandmother filed against her. The prosecutor identified additional "worms": that one of E.S.'s "recantations" [Footnote: According to the prosecutor, E.S. did not deny defendant had abused her, but rather, said she did not remember if he had] occurred after she was visiting with defendant while he was on parole and subject to a "no-contact-with-children order"; that defendant violated parole and was sent back to prison three times; that defendant was charged with misdemeanor battery for "beat(ing) (E.S.) up while she was pregnant"; that E.S. was financially dependent on defendant; and that E.S. was concerned her mother would be left without support if defendant returned to prison.

The current trial consisted of eight court days of argument and testimony. The trial court did not abuse its discretion by declining to permit a full-blown trial on an ancillary impeachment issue that would have more than doubled the length of trial.

Further, the trial court's ruling did not, as defendant asserts, "deprive() . . . defendant of all evidence concerning the theory of defense." Instead, the court's evidentiary ruling was limited to certain evidence intended to rebut a single item of propensity evidence. The court's ruling did not preclude defendant from defending against the merits of the prosecution's pending case. And even as to the narrow issue of propensity evidence, the court ruled defendant could (1) deny he sexually abused E.S.; (2) accuse her of lying about it; (3) argue that her living with him later undermined her claim; and (4) present character evidence that he did not molest other children when presented with similar opportunities. The record shows defendant did, in fact, (1) deny he sexually abused E.S.; (2) elicit from V.S. that she believed defendant when he said he did not molest E.S. and that "there were things that were said" to her that caused her to believe that; and (3) argue in closing that "(a) reasonable interpretation as to why (defendant) would let (E.S.) come back into his home is because she confessed to him nothing happened . . . ." Defendant was not completely deprived of an opportunity to present an adequate defense.

Defendant's only argument on appeal regarding undue consumption of time is that "the more extensive and time consuming the evidence that (defendant) did not molest (E.S.) the greater the importance of the evidence to (his) defense." We reject this reasoning as circular - it would effectively read the undue-consumption-of-time element out of Evidence Code section 352.

Finally, none of defendant's cited cases support his argument that the trial court was required to admit his impeachment evidence. *People v. Cottone* (2013) 57 Cal.4th 269 is distinguishable because it involved uncharged prior conduct and addressed whether the defendant's maturity was a relevant factor in evaluating whether he had a propensity to commit sexual offenses. (*Id.* at pp. 278, 290.) Here, defendant was charged with sexually abusing E.S. and his maturity was not at issue. *People v. Griffin* (1967) 66 Cal.2d 459, 465 and *People v. Mullens* (2004) 119 Cal.App.4th 648, 662–663 are distinguishable because the trial courts admitted evidence of charged prior sexual offenses but excluded evidence that the defendants had been acquitted of those charges. By contrast, defendant was convicted of sexually abusing E.S. *People v. Callahan* (1999) 74 Cal.App.4th 356 is unpersuasive because that court

17cv0023-LAB(MSB)

"conclude(d) that when the prosecution introduces evidence under (Evidence Code) section 1108 of the defendant's commission of another sexual offense or offenses, the defendant is not precluded from introducing evidence of specific instances of his good behavior under similar circumstances." (*Id.* at p. 360.) Here, the trial court ruled defendant could do precisely that.

On this record, we find no abuse of discretion in the trial court's exclusion of admittedly time-consuming evidence aimed at impeaching E.S.'s testimony during the trial that led to defendant's 1995 conviction.

(Lodgment No. 5, People v. Storey, No. D065025, slip op. at 8-19.)

Clearly established federal law provides that Petitioner has a right to "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting Trombetta, 467 U.S. at 485) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (internal citations omitted). The Supreme Court has stated:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967).

However, "the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." Holmes v. South Carolina, 547 U.S. 319, 326-27 (2006) (internal quotation marks omitted). Applying these principles, the Ninth Circuit has stated:

/ / /

> In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion. In balancing these interests, we must, on the one hand, afford "due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable . . . evidence." On the other hand, we must stand vigilant guard over the principle that "(t)he right to present a defense is fundamental" in our system of constitutional jurisprudence. In light of these competing interests, federal habeas courts must "determine what weight the various interests will carry when placed on the scales," and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.

Chia v. Cambra, 360 F.3d 997, 1003-04 (9th Cir. 2004) (citations omitted).

As an initial matter, Respondent argues that because Petitioner's 1995 conviction for committing a lewd act on his daughter E.S. was introduced as evidence of his propensity to commit the charged acts of committing lewd acts on his daughters K.S., I.S. and V.S., it does not implicate his right to present a complete defense to the charges he was facing at trial because it merely implicated an ancillary issue of propensity. The Supreme Court has noted in the context of federal evidentiary rules that prejudice can result from introduction of propensity evidence to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," because it risks the jury convicting a defendant because he is "a bad person [who] deserves punishment." Old Chief v. United States, 519 U.S. 172, 180-81 (1997). However, the Supreme Court has specifically declined to decide whether the introduction of a prior offense as propensity evidence in a state criminal trial could violate federal due process. See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); see also Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) (noting that because the Supreme Court reserved the issue in McGuire and has since denied certiorari at least four times on that issue since, there is no clearly established federal law on the issue). Although there is no "clearly established federal law"

on that issue within the meaning of 28 U.S.C. § 2254(d), see Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists), in light of Old Chief, the Court declines to accept Respondent's characterization of the right to present a complete defense as excluding propensity because it is an ancillary issue.

Nevertheless, the Court finds that it was objectively reasonable for the state court to determine that the exclusion of the evidence did not deny Petitioner his federal constitutional right to present a complete defense. The factors relevant to that inquiry are: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Chia, 360 F.3d at 1004.

The central issue at trial was whether Petitioner's children I.S. and V.S. were telling the truth when they testified he molested them or when they previously said he did not, and whether K.S. was telling the truth when she testified that he did not molest her or when she previously said he had. The jury was asked to judge their credibility not only by their demeanor, but through expert testimony regarding child abuse victim reporting in general and their prior statements in particular, as well as the fact that Petitioner had previously been convicted of molesting another daughter. They heard testimony from women who lived with him and his children regarding household dress, deportment and sleeping arrangements, as well as from a coworker who testified Petitioner expressed a sexual interest in young women, all of which suggested he harbored a sexual attraction to young girls and had arranged his household to give himself the means to sexually abuse his daughters. There was minimal probative value to evidence that another one of his children, E.S., was pressured by her grandmother to fabricate allegations fifteen years earlier in order to retain custody, on whether three different children, two of whom (K.S. and I.S.) had not been born at that time, were fabricating their allegations for some other unstated reason. In addition, he challenged his prior conviction in several respects, and because K.S., I.S.

and V.S. all gave conflicting accounts, the inability to reach a verdict as to K.S. shows his defense was not overshadowed by whatever evidentiary value his prior conviction had to show a propensity for molesting his daughters. Evidence E.S. had later recanted had little probative value on the central issue at trial of who was being truthful.

The second factor, the reliability of E.S.'s retractions, does not weigh in Petitioner's favor. Despite the allegation E.S. told at least three people she fabricated her allegations, expert opinion evidence was presented at trial by the prosecution that children often falsely deny abuse because they feel ashamed and embarrassed, or believe they will be in trouble, or will cause a person they love to be in trouble, and by the defense that conflicting statements can raise serious concerns regarding reliability. His proffered evidence showing E.S. recanted would have been subject to the same expert testimony regarding why children are reluctant to tell the truth about sexual abuse.

The third factor, whether E.S.'s recantation would have been capable of evaluation by the trier of fact, weighs slightly against Petitioner. The defense's own expert testified that conflicting accounts raised concerns regarding credibility. Unlike the live testimony at trial the jury was asked to evaluate with respect to the other children, the evidence of E.S.'s recantation would have been stale hearsay. And in addition to allowing introduction of the evidence, which convinced the jury in the 1995 case to believe Petitioner sexually abused E.S., the prosecution would have been entitled to introduce their evidence that E.S.'s recantation was suspect.

The next factor, whether it is the sole evidence on the issue or merely cumulative, weighs against Petitioner. The evidence he wished to present was cumulative to the evidence he presented challenging his prior conviction, including: (a) his own testimony that he was innocent and E.S. fabricated her allegations, (b) evidence E.S. moved back in with him immediately after he was released from the prison term he served for molesting her, which he suggested could only have happened if she admitted she was not molested and asked Petitioner to forgive her, (c) V.S.'s testimony that E.S. asked her to write the letter to the court detailing his abuse because E.S. was having a dispute with Petitioner over

phone and cable bills, and (d) V.S.'s testimony that in 1995 she honestly believed Petitioner had not molested E.S. based on something she was told, which the defense attempted to argue was because V.S. learned that E.S. had recanted.

The final factor, whether a challenge to the 1995 conviction constituted "a major part of the attempted defense," weighs against Petitioner. His defense focused on his credibility against the credibility of the witnesses against him, informed by expert opinion regarding the willingness of children to accurately report abuse. Although his denial that he abused K.S., I.S. and V.S. was undermined by his prior conviction for abusing E.S., the jury's inability to reach a verdict on the counts involving K.S., and the fact that they spent the majority of their four days of deliberation having testimony read back, is an indication they did not rely heavily on the propensity evidence, but carefully weighed all the evidence and made individual determinations regarding the credibility of the witnesses despite what they may have thought of his propensity, if any, to commit such crimes.

Accordingly, in light of defense counsel's representation that presenting evidence challenging the 1995 conviction might double the length of the trial, it was not objectively unreasonable for the state court to assign less weight to Petitioner's proffered additional challenge to his prior conviction than to the "substantial" interest of the trial court to judicial efficiency and preservation of an orderly trial. Chia, 360 F.3d at 1003-04 (holding that "federal habeas courts must determine what weight the various interest will carry when placed on the scales, and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.") (internal citation omitted). The Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Id.; see also Washington, 388 U.S. at 18-22 (holding that the right to compulsory process is violated if a criminal defendant is *arbitrarily* denied the opportunity to call a witness capable of presenting testimony relevant and material to the defense); Holmes, 547 U.S. at 324 (holding that "the Constitution permits judges to exclude evidence that . . . poses an undue risk of harassment, prejudice,

(or) confusion of the issues."); <u>Chambers</u>, 410 U.S. at 294 ("The right of an accused in a criminal trial to due process is, in essence, the right to a *fair opportunity* to defend against the State's accusations.") (emphasis added).

In addition, the Court finds that any error in ruling inadmissible Petitioner's evidence challenging his prior conviction is harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993). The <u>Brecht</u> standard "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998) (internal citations and quotation marks omitted). "Under this standard, an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" <u>Padilla v. Terhune</u>, 309 F.3d 614, 621-22 (9th Cir. 2002) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995)); <u>Kotteakos v. United States</u>, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.").

Petitioner contends the error in excluding evidence challenging his prior conviction was prejudicial because: (a) this was a close case, as the jury deliberated four days, asked for numerous read backs, and could not reach a verdict on K.S., (b) V.S. testified in the 1995 case that Petitioner had not molested her, and she did not come forward with her allegations until at least 2005, and (c) although I.S. testified at trial that Petitioner molested her, she previously repeatedly either denied he had or did not report the abuse to law enforcement, Child Protective Services, and during her four forensic interviews. (ECF No. 1 at 42-43.) Petitioner was permitted to testify that E.S. had fabricated her allegations against him, and was able to elicit from V.S. on cross-examination that she had testified

falsely in 1995 because she believed Petitioner had not molested E.S. based on something V.S. had heard. Although the jury was instructed to disregard closing argument that her belief was based on E.S. saying that their grandmother had forced her to fabricate the allegations, defense counsel was still able to argue that the only explanation for E.S. being allowed to live with Petitioner after he served a prison term for molesting her was that she had confessed to Petitioner she had fabricated the allegations and he forgave her. The defense also succeeded in having V.S. admit on cross-examination that she initially wrote the letter to the court detailing her allegations against Petitioner because E.S. had asked for assistance in a dispute with Petitioner over phone and cable bills. Presentation of additional evidence consisting of hearsay statements that E.S. recanted would have been cumulative, and in some ways duplicative, of that evidence, and would not have rebutted the strong direct testimony of I.S., V.S., and the people who lived with them, particularly in light of the expert testimony by both sides explaining that any recantation by E.S. may have been false. In light of the fact that the jury was unable to reach a verdict on the charges relating to K.S., the expert testimony from both parties regarding the pressures abuse victims feel to falsely deny abuse, and the cumulative and duplicative nature of the excluded evidence, the Court does not have a "grave doubt" that refusing to allow Petitioner to present additional evidence challenging his prior conviction in the form of hearsay statements that E.S. had recanted, which may have opened the door to presentation of the same evidence that convinced a jury in 1995 to convict him on the same charge, had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>Padilla</u>, 309 F.3d at 621-22.

Accordingly, the Court recommends denying habeas relief as to claim one on the basis that the state court adjudication of the claim is neither contrary to, nor an unreasonable application of, clearly established federal law, is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, and, even if Petitioner could satisfy that standard, the alleged error is harmless.

/ / /

17cv0023-LAB(MSB)

**C.    Claim Two**

Petitioner alleges in claim two that his rights under the Fifth, Sixth and Fourteenth Amendments to due process and to present a complete defense were violated by a jury instruction, which informed the jury they were not to consider for their truth I.S.'s statements during her forensic interview denying Petitioner abused her, and instructing them they were only allowed to consider them to evaluate Dr. Edwards' opinion that the repeated forensic interviewing and questioning in the face of her denials of abuse raised concerns regarding the reliability of I.S.'s trial testimony that she was abused.  (ECF No. 1 at 6, 44-50.)

Respondent answers that this claim does not raise a federal constitutional issue because, even though instructional error was conceded on appeal, clearly established federal law provides that such an instructional error does not rise to the level of a federal due process violation unless it rendered the trial fundamentally unfair, which it did not.  (Ans. Mem. at 25.)  Respondent also contends the error is harmless because the instruction was confined to the evaluation of the expert opinion, and other instructions allowed the jury to consider I.S.'s statements for their truth.  (Id. at 25-27.)

Petitioner presented this claim to the state supreme court in a petition for review.  (Lodgment No. 6.)  The petition was denied with an order which stated: "The petition for review is denied."  (Lodgment No. 7.)  It was presented to the appellate court on direct appeal and denied in a written opinion.  (Lodgment Nos. 3, 5.)  The Court will look though the silent denial by the state supreme court to the last reasoned state court opinion, the appellate court opinion on direct appeal, which states:

> Defendant contends the trial court committed reversible error by instructing the jury not to consider for their truth I.S.'s statements during pretrial forensic interviews that defendant did not sexually abuse her.  The People concede this instruction was erroneous, but assert it was harmless in light of the record and overall charge to the jury.  We agree.
>
> A.    *Proceedings Below*
>
> At trial, recordings of four forensic interviews of I.S. were played for the jury without objection.  The parties appear to have agreed they were

17cv0023-LAB(MSB)

admissible as prior inconsistent statements. (Evid. Code, § 1235.) Although I.S. testified at trial that defendant sexually abused her, in the interviews she denied any sexual abuse occurred.

Clinical and forensic psychologist Joanna Edwards testified on defendant's behalf regarding children's "suggestibility" during interviews. Edwards considered I.S.'s earlier denials when assessing the reliability of her later testimony.

Even though counsel agreed I.S.'s forensic interviews had not been admitted for a limited purpose (that is, they were admitted for their truth), the trial court instructed the jury to the contrary with CALCRIM No. 360:

> "Dr. Joanna Edwards testified that in reaching her conclusions as an expert witness, she considered statements made by (I.S.) and (K.S.). You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements (is) true.

The court also instructed the jury with CALCRIM No. 318:

> "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

> "To evaluate whether the witness's testimony in court is believable;["]

> "AND["]

> "As evidence that the information in those earlier statements is true."

In closing argument, defense counsel repeatedly encouraged the jury to believe I.S.'s statements during her forensic interviews over her trial testimony:

> "Let's talk about (I.S.). The district attorney didn't want you to see the real (I.S.) back in 2011 when she's eating Play–Doh® during the break. It's sad, but the reality is that (I.S.) has a delay that not just prevents her from being able to speak her mind, but being able to perceive events, hear them, and then say them back. (I.S.) had been interviewed numerous times and denied that there was any touching. And in four interviews, she denied that my client had done anything wrong to her. Go back and look at those interviews, because what's interesting is that no matter how many times she denies, she's not getting out of that room. Laurie

Fortin wants to keep going until she admits, which is why Laurie Fortin keeps going."

(¶) . . . (¶)

"So, (I.S.) denies any touching, comes in as if she had no delay, as if there was nothing wrong with her ability to perceive events. In August of 2012, the first question she's asked (during the preliminary hearing) is, do you know why you are here today? She said, yes, my daddy did touching to my private parts. Wow. You saw her in that video. How did she change from those videos to that if it wasn't coaching over the years?"

During deliberations, the jury requested the video of K.S.'s (but not I.S.'s) forensic interview. The request was granted without objection. Although the jury requested several witnesses' trial transcripts, Edwards's was not among them.

## B. *Relevant Law*

We review de novo the propriety of jury instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek*); see generally *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) [Footnote: We reject defendant's suggestion that we should assess prejudice under the federal constitutional standard of harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Contrary to defendant's view, the error did not impact his right to present a complete defense under the Fifth and Sixth Amendments, or to due process under the Fourteenth Amendment. Defendant's reliance on *Gonzales v. Lytle* (10th Cir. 1999) 167 F.3d 1318 is misplaced. There, the jury was precluded entirely from hearing a witness's inconsistent statement. Here, the jury heard all of I.S.'s forensic interviews.] "'(T)he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*Hajek, supra*, at p. 1220.) "(W)e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) "'Moreover, any theoretical possibility of confusion (may be) diminished by the parties' closing arguments . . . .'" (*Hajek*, at p. 1220, brackets in original.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

C.    *Analysis*

Accepting the People's concession that the trial court erred by instructing the jury with CALCRIM No. 360 in light of the admission of I.S.'s forensic interviews under a hearsay exception, we conclude the error was harmless. [Footnote: The bench notes accompanying CALCRIM No. 360 state: "This instruction should not be given if all of the statements relied on by the expert were admitted under applicable hearsay exceptions."] Although CALCRIM No. 360 instructed jurors they could not consider I.S.'s forensic interviews for their truth when evaluating Edwards's opinions, CALCRIM No. 318 instructed jurors they could consider them for their truth, generally.

"(A)ny theoretical possibility of confusion" (*Hajek, supra*, 58 Cal.4th at p. 1220) was eliminated by defense counsel's encouragement to jurors that they "(g)o back and look at those interviews" when evaluating the veracity of I.S.'s testimony. The encouragement was wholly unrelated to the validity of Edwards's opinions. That any confusion is merely theoretical is borne out by the jury's request for K.S.'s forensic interview and not Edwards's trial testimony - jurors would not have requested K.S.'s interview alone if they did not believe they could consider it independently from Edwards's opinions. Moreover, the fact that the jury deadlocked on the counts relating to K.S. - despite her trial testimony that defendant never sexually abused her - suggests the jurors who were willing to convict defendant on those counts considered K.S.'s statements during her forensic interviews for their truth.

Defendant cites *People v. Clark* (2011) 52 Cal.4th 856 (*Clark*) to support the proposition that CALCRIM No. 360 "would interfere with defense attempts to use the statements relied upon by an expert for their truth." *Clark* is inapposite. There, the Supreme Court - after finding the defendant forfeited the issue - rejected the defendant's claim that the trial court erred by not instructing with CALCRIM No. 360's predecessor, CALJIC No. 2.10. (*Clark*, at p. 942.) Here, defendant asserts the trial court erred by instructing with CALCRIM No. 360. The *Clark* court's speculation about what "might have" happened had the court instructed the jury with CALJIC No. 2.10 is not instructive here. (*Clark*, at p. 942.) [¶] On this record, we conclude there is no reasonable likelihood the jury believed it could not consider I.S.'s forensic interviews for their truth. Thus, any instructional error was harmless.

(Lodgment No. 5, <u>People v. Storey</u>, No. D065025, slip op. at 20-24.)

Clearly established federal law provides that in order to merit federal habeas relief on an instructional error, Petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>McGuire</u>, 502

U.S. at 72 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)). The Court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." <u>McGuire</u>, 502 U.S. at 72 (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)). The instruction must be considered in the context of the trial record and the instructions as a whole. <u>McGuire</u>, 502 U.S. at 72; <u>Cupp</u>, 414 U.S. at 146-47. Even if Petitioner could show that the instructional error "so infected the entire trial that the resulting conviction violates due process," he is not entitled to federal habeas relief unless he can show that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>California v. Roy</u>, 519 U.S. 2, 5 (1996).

When a federal habeas court is reviewing a state court determination that a federal constitutional error is harmless, it is required to determine whether the error was harmless under <u>Brecht</u> even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d). <u>Fry</u>, 551 U.S. at 119-22; <u>see</u> <u>Pulido v. Chrones</u>, 629 F.3d 1007, 1012 (9th Cir. 2010) (holding that a federal habeas court does not need to conduct a 28 U.S.C. § 2254(d) analysis to determine "whether the state court's harmlessness determination on direct review . . . was contrary to or involved an unreasonable application of clearly established federal law . . . because the <u>Brecht</u> test 'obviously subsumes' the more liberal [§ 2254(d) standard]") (quoting <u>Fry</u>, 551 U.S. at 119-20). Although the state court here found the error harmless, it found it did not rise to the level of a federal constitutional violation. In order to determine if that finding is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), the Court must determine whether a federal due process violation occurred.

Respondent concedes state law error, but argues it does not rise to the level of a federal due process violation, and even if it does, the federal error is harmless. (Ans. Mem. at 26.) Petitioner argues that the instruction which allowed the jury to consider I.S.'s statements for their truth was, unlike the erroneous instruction, permissive, in that it informed the jury they may use her statements as evidence she was lying, and generic, in that it did not specifically refer to her statements. (ECF No. 1 at 49-50.) He contends the

jury would have thought the erroneous instruction controlled because it was specific, which would have caused them to ignore extremely powerful exculpatory evidence that he was not guilty of the two counts involving I.S., and but for the error, they would have had a reasonable doubt on those counts. (Id. at 50.)

This Court applies a presumption that jurors follow their instructions. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them."). That presumption may be overcome where there is "a strong likelihood that the effect of the [error] would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). Petitioner has made no such showing. Rather, the record supports the state court finding that the instructions as a whole allowed the jury to consider I.S.'s statements not just in their consideration of Dr. Edwards' opinion regarding the reliability of her trial testimony, but also for their truth. During deliberations the jury did not ask to view I.S.'s forensic interviews or Dr. Edwards' testimony, but received read backs of the testimony of V.S., K.S., I.S. and Dr. McLennan, and viewed K.S.'s forensic interview. They could not reach a verdict regarding K.S. even after viewing her forensic interview a second time, despite the fact that she testified at trial she was not abused but denied abuse in her forensic interview. The record supports a finding they understood their instructions as permitting them to use the forensic interview statements independently for their truth, and Petitioner has not overcome the presumption the jury attended "closely the particular language of the trial court's instructions, and strived "to understand, makes sense of, and follow the instructions given them." Franklin, 471 U.S. at 324 n.9.

For those reasons, and in light of defense counsel's argument that I.S.'s stark change from repeated denials of abuse to her testimony of abuse showed coaching, considering the erroneous instruction in the context of the trial record and the instructions as a whole, the Court finds that Petitioner has failed to show the instructional error "by itself so infected the entire trial that the resulting conviction violates due process," or that there "is a

reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." McGuire, 502 U.S. at 72.  Thus, the state court finding that the instructional error did not rise to the level of a federal due process violation is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

Even if Petitioner could show that the instructional error "so infected the entire trial that the resulting conviction violates due process," he is not entitled to federal habeas relief unless he can show the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.  The defense, not the prosecution, played I.S.'s recorded forensic interviews for the jury, and defense counsel highlighted during closing arguments the fact that I.S. had denied touching during all four forensic interviews, telling the jury: "Go back and look at those interviews, because what's interesting is that no matter how many times she denies, she's not getting out of that room.  Laurie Fortin wants to keep going until she admits, which is why Laurie Fortin keeps going." (RT 3313.)  The jury was deadlocked 11 to 1 in favor of finding Petitioner guilty on the counts involving K.S. (RT 3355), despite the fact that she testified Petitioner had not abused her but stated he had in her forensic interview.  The instruction could not have resulted in the jury ignoring I.S.'s forensic interview statements in their determination of whether Petitioner had molested her, because it did not prevent the jurors from considering K.S.'s forensic interview statements in their determination whether Petitioner had molested her.  Accordingly, assuming the error rose to the level of a federal due process violation, Petitioner has not shown it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

The Court recommends denying habeas relief as to claim two on the basis that the state court adjudication of the claim is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Even if Petitioner could satisfy that standard, any error is clearly harmless.

17cv0023-LAB(MSB)

## D.    Claim Three

Petitioner alleges in claim three that his Fourteenth Amendment right to have every element of an offense proven beyond a reasonable doubt was violated because the jury was erroneously instructed that the triggering date of the one-year statute of limitations was November 28, 2011, when V.S. told Detective Burow Petitioner molested her when she was 13 years old, whereas her trial testimony was ambiguous whether she informed Child Protective Services or the police in 2005 he had molested her.  (ECF No. 1 at 6, 51-56.)

Respondent answers that this claim does not present a federal question because, to the extent it alleges an instructional error, any such error did not render the trial fundamentally unfair, and to the extent it alleges a failure to prove every element of an offense beyond a reasonable doubt, Petitioner has failed to show that the factual findings of the state court are objectively unreasonable.  (Ans. Mem. at 27-30.)

This claim was presented to the state supreme court in a petition for review and summarily denied.  (Lodgment Nos. 6-7.)  It was presented to the appellate court on direct appeal, (Lodgment No. 3), and denied in a reasoned opinion, (Lodgment No. 5).  The Court will look through the silent denial of this claim by the state supreme court to the last reasoned decision, the appellate court opinion, which stated:

> The statute of limitations for a violation of section 288, subdivision (a) is normally six years.  (§ 800; *People v. Smith* (2011) 198 Cal.App.4th 415, 424 (*Smith*).)  If it has expired, it may be reopened for a one-year period beginning when the victim first reports to a law enforcement agency the commission of a crime involving substantial sexual conduct.  (§ 803, subd. (f)(1), (2)(B); *Smith*, at p. 424.)  Defendant asserts V.S. first reported the crimes committed against her to law enforcement in 2005, while the People assert she first reported them in 2011.  [Footnote: The People acknowledge a 2005 report to CPS, but contend it was insufficient to trigger the extended statute of limitations because it was not to a law enforcement agency and did not disclose substantial sexual conduct.]  Because prosecution commenced in 2012, the timeliness of counts 7 through 23 (defendant's sexual abuse of V.S. in 1988) depends on when the extended statute of limitations was triggered. Defendant contends the trial court improperly resolved this alleged factual dispute itself when it instructed the jury that the extended statute of limitations was triggered in 2011.  We disagree.

A.    *Proceedings Below*

To establish the prosecution was timely, the prosecutor sought to show during V.S.'s direct examination that she first reported the details of defendant's sexual abuse of her to law enforcement in November 2011. V.S. testified she met with Detective Burow on November 28, 2011, and told him "(a)ll the incidents that happened when (she was) 13 years old in 1988(.)" When asked if this was her first disclosure to "law enforcement," V.S. initially stated she "called the police" after watching an episode of Oprah in 2005 to warn them defendant might molest his other daughters.  V.S. later clarified the 2005 call was to CPS and that 2011 was the first time she disclosed the sexual abuse to police.

On cross-examination, defense counsel sought to establish the 2005 call was to law enforcement, not CPS.  V.S. answered "(y)es" to leading questions that asked whether she "contacted the police department," "pick(ed) up a phone and contact(ed) a police officer," and had a "conversation . . . with the police officer about briefly what happened to (her.)"

On redirect examination, the prosecutor showed V.S. a report from CPS dated November 15, 2005.  V.S. read the report and testified it refreshed her recollection that her 2005 call was to CPS and that her 2011 report to Detective Burow was her first report of the sexual abuse to law enforcement. [Footnote:  "(Prosecutor:) You said it could have been police (you called), it could have been CPS.  (¶)  *Now that I've shown you that report*, here's the question:  Did you, prior to talking to Detective Burow in 2011, did you ever report to law enforcement what the defendant specifically did to you?  (¶) (V.S.:)  No.  (¶) . . . (¶) (Prosecutor:)  And just to be clear, *that report, those phone calls that you made, that would have been to CPS in San Diego*?  (¶) (V.S.:)  Yes.  (¶) . . . (¶) (Prosecutor:)  But just so we are clear.  *The call that you remember specifically was to CPS*?  (¶) (V.S.:)  Yes.  (¶) (Prosecutor:)  And Detective Burow (was) the first law enforcement officer that you ever spoke with?  (¶) (V.S.:)  Yes." (Italics added.)]

On recross-examination, V.S. again responded "(y)es" to leading questions that asked if she "contacted the police department" and "told the police department that (she) had been molested."

V.S. also testified regarding the extent of her disclosure in 2005. Initially, when asked if she "disclose(d) . . . in detail" in 2005 "all the details that (she) provided . . . in court," V.S. responded, "Probably.  I don't remember."  However, she later clarified that in 2005 she gave only a "general

report" that she had been sexually abused; she "didn't give any details." V.S. testified repeatedly that her 2011 report to Detective Burow was "the first time (she) ever sat down with a police officer and provided all of those details about what happened to (her)." She acknowledged on re-redirect examination that "(i)n no uncertain terms did (she) ever report to any California law enforcement agency before November 28, 2011 specific acts of the defendant touching (her) vagina with his hand" or orally copulating her when she was 13. Defense counsel's questioning conceded V.S. did not disclose the details of her molestation in her 2005 report. [Footnote: "(Defense Counsel:) I understand that *you didn't give all the details* that you have now given, but (did) you at least let law enforcement know that something had happened to you back in the days and you were concerned? (¶) (V.S.:) Yes. (¶) . . . (¶) (Defense Counsel:) It's fair to say that when you did contact the police department you did tell them that you were molested, *but you did not go into details*? (¶) (V.S.:) That is correct." (Italics added.)]

Detective Burow testified he interviewed V.S. on November 28, 2011. V.S. reported to him that defendant touched her vagina with his hand, orally copulated her, and had her orally copulate him when she was 13. V.S. also told Burow this was her first report of the abuse to law enforcement. Burow verified this claim by reviewing a regional law enforcement database that contains records dating back seven to 10 years, and city-wide police records of child abuse reports that are retained for at least 10 years. Burow's review of the database and records did not reveal any prior report by V.S.

The prosecutor offered the following jury instruction regarding the extended statute of limitations' triggering date:

> "If you find the defendant guilty of a violation of Section 288(a) . . . as charged in Counts 7 thru 23, pursuant to Penal Code section 803(, subdivision) (f)(1), you must further decide whether the People have proved the following factual allegations by a preponderance of the evidence: (¶) (1) On April 11, 2012, a complaint was filed in this case, and on August 7, 2012, an amended complaint was filed in this case, *within a year of the victim's report of the crime to a California law enforcement agency on November 28, 2011*." (Italics added.)

Defense counsel objected and instead offered a general instruction on statute of limitations (CALCRIM No. 3410). The court used the prosecutor's instruction.

## B. *Relevant Law*

"Ordinarily, the statute of limitations for a violation of section 288, subdivision (a) is six years under section 800." (*People v. Maguire* (2002) 102 Cal.App.4th 396, 399.) However, section 803, subdivision (f) "allows the prosecution to file an action after the expiration of the six-year statute when: (1) a victim of any age reports to a California law enforcement agency a violation that occurred while the victim was under age 18; (2) the crime involves 'substantial sexual conduct'; (3) independent evidence clearly and convincingly corroborates the victim's allegation; and (4) the criminal complaint is filed within one year of the date the report was made to law enforcement." (*Maguire*, at pp. 399-400 (discussing former section 803, subdivision (g)).) There are two significant nuances to these triggering criteria. First, the report must be made to a law enforcement agency; a report to CPS is insufficient. (*Maguire*, at pp. 399-400.) Second, the report "must refer to unlawful sexual abuse acts involving substantial sexual conduct"; a general report of sexual abuse is insufficient. (*People v. Superior Court* (*Maldonado*) (2007) 157 Cal.App.4th 694, 702.)

"'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender," excluding "masturbation that is not mutual." (§§ 1203.066, subd. (b), 803, subd. (f)(2)(B).) This exclusion "refers to a defendant's self-masturbation in the presence of the victim." (*People v. Terry* (2005) 127 Cal.App.4th 750, 771 (*Terry*), citing *People v. Lamb* (1999) 76 Cal.App.4th 664, 679 (*Lamb*).) Therefore, a defendant's "acts in masturbating the victim fall within the definition of mutual masturbation." (*Lamb*, at p. 682; see *Terry*, at p. 771.) [Footnote: Defendant argued to the contrary in his reply brief, but withdrew the argument before oral argument.]

Although the prosecution bears the burden of proving each element of an offense beyond a reasonable doubt, "the statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a preponderance of the evidence." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 241.)

As discussed above, we review de novo the correctness of the trial court's instructions to the jury. (*People v. Posey, supra*, 32 Cal.4th at p. 218.) The trial court has no duty to give an instruction that is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) In this regard, substantial evidence is "evidence sufficient to 'deserve consideration by the

17cv0023-LAB(MSB)

jury,' not '. . . any evidence . . . presented, no matter how weak.'" (*People v. Williams* (1992) 4 Cal.4th 354, 361.)

C.    *Analysis*

The trial court did not err by instructing the jury that the extended statute of limitations was triggered in 2011 rather than 2005.   First, no substantial evidence supports defendant's claim that V.S. reported sexual abuse to a law enforcement agency in 2005.   Rather, the record is clear that V.S.'s 2005 report was to CPS.   She so testified on direct examination.   After defense counsel's cross-examination led V.S. to adopt references to "police" and "law enforcement," V.S. clarified on redirect - after reviewing the 2005 CPS report documenting her call - that her call was to CPS.   V.S.'s affirmative responses to defense counsel's leading questions demonstrate only that V.S., as a lay witness, did not appreciate the significance of the legal distinction between CPS and a law enforcement agency.   [Footnote: The prosecutor sought to clarify this distinction, stating within a broader question, "As lawyers we get used to what's a police department and CPS."   Defense counsel objected on hearsay and foundational grounds, and the trial court sustained the objection.]   Any doubt was resolved by Detective Burow's testimony that his search of law enforcement databases and records that date back to at least 2004 - the year before V.S.'s 2005 report - did not reveal any report of sexual abuse by V.S.   Thus, no substantial evidence would have supported a jury instruction premised on V.S.'s 2005 report having been made to a law enforcement agency.

Even if V.S.'s 2005 report had been to a law enforcement agency, it still would not have triggered the extended statute of limitations because V.S. did not report "substantial sexual conduct" (§ 1203.006, subd. (a)(8)) - she gave only a "general report" that she had been sexually abused, without "giv(ing) any details."   V.S. testified consistently that, "(i)n no uncertain terms," her first report of the details of defendant's sexual abuse of her was to Detective Burow in 2011.   Defense counsel's questioning conceded as much. Thus, no substantial evidence would have supported a jury instruction premised on V.S. having reported substantial sexual conduct in 2005.

Because no substantial evidence would have supported a jury instruction premised on V.S.'s 2005 report having been made to a law enforcement agency or having disclosed substantial sexual conduct, the trial court did not err by instructing the jury that the extended statute of limitations was triggered in 2011 rather than 2005.

17cv0023-LAB(MSB)

(Lodgment No. 5, <u>People v. Storey</u>, No. D065025, slip op. at 24-30.)

As noted above in claim two, clearly established federal law provides that in order to merit federal habeas relief on an instructional error, Petitioner must show the error "by itself so infected the entire trial that the resulting conviction violates due process." <u>McGuire</u>, 502 U.S. at 72. The Court must "inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." <u>Id.</u> Even if Petitioner satisfies those standards," he is not entitled to federal habeas relief unless he can show that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>Roy</u>, 519 U.S. at 5.

Petitioner has identified no "clearly established federal law" which prohibits a conviction on criminal charges merely because they were brought past a state statute of limitations. <u>See</u> <u>Loeblein v. Dormire</u>, 229 F.3d 724, 726 (8th Cir. 2000) (citing <u>Plaut v. Spendthrift Farm, Inc.</u>, 529 U.S. 211, 229 (1995)) ("[A] state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute."). However, § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." <u>White v. Woodall</u>, 572 U.S. 415, 427 (2014) (quoting <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007)).

The United States Supreme Court has determined that claims alleging pre-charging delay are properly analyzed as due process violations under the Fifth Amendment, which require a showing of actual prejudice from the delay, and, mindful that a defendant may not always be able to show actual prejudice from a delay, has stated that:

> The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge. As we have said, the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges. Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defense. These statutes provide predictability by specifying a limit beyond which there is an

17cv0023-LAB(MSB)

irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.

The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

United States v. Marion, 404 U.S. 307, 322-23 (1971) (internal quotation marks and citations omitted).

Even if clearly established federal law protects Petitioner from conviction on charges brought after expiration of the statute of limitations, the finding by the state court that no substantial evidence supported a finding that V.S. reported to law enforcement prior to 2011 that Petitioner had molested her is objectively reasonable. As the state court observed, she testified to that at trial, and any confusion arising from her testimony was clarified by Detective Burow who testified that he confirmed through law enforcement databases that there were no such prior reports. In addition, V.S.'s 2005 report to the Child Protective Services did not provide detailed allegations. As the state court observed, such a report would not have triggered the running of the statute of limitations under state law. A state court's interpretation of a state statute of limitations binds a federal court sitting in habeas. McGuire, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). This Court must defer to the state court's construction of state law unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).

17cv0023-LAB(MSB)

Nevertheless, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness."). Thus, even if clearly established federal law protected Petitioner from conviction on criminal charges brought after expiration of the state statute of limitations, he has not shown that the state court erred, or that it's decision is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow, 877 F.2d at 1399.

Petitioner also contends his right to have every element of his offenses proven beyond a reasonable doubt was violated by what amounted to a directed verdict on the issue of the statute of limitations. (ECF No. 1 at 55; Traverse at 3.) "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A petitioner is entitled to federal habeas corpus relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). As set forth above, V.S.'s testimony that she did not come forward with specific allegations that Petitioner had molested her until she spoke with Detective Burow in 2011, despite the fact that she informed Child Protective Services in 2005 that Petitioner's children were in danger of being molested but without specific allegations that Petitioner had molested her, and Detective Burow's testimony that there was no record of V.S. having informed law enforcement prior to 2011, supports a finding that the jury was provided with sufficient evidence to find beyond a reasonable doubt that the statute of limitations began to run in 2011, rather than 2005. The state court observed that state law provides that charges must be brought within one year from when the victim first reports

the crime to law enforcement.  See California Penal Code § 803(f)(1).  This Court is bound by state law regarding the running of the limitations period.  See Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."). The evidence showed that V.S. first reported her allegation to law enforcement in 2011, and Petitioner was not deprived of his federal due process right to have every element of the charged offenses proven beyond a reasonable doubt.

Finally, assuming the trial court erred in instructing the jury that the statute of limitations began to run in 2011, and should have allowed them to decide for themselves whether it began running earlier, the error is harmless.  There was no evidence from which the jury could have found that V.S. reported to law enforcement prior to 2011 that Petitioner had molested her.  Rather, she testified that she made a vague report to Child Protective Services in 2005, and was informed that her report was insufficient to trigger action by that agency because it lacked specificity, and Detective Burow testified that there was no record of a report to law enforcement prior to 2011.  Accordingly, assuming an instructional error, Petitioner has not shown it had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

In sum, the Court finds that the state court adjudication of claim three is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  In addition, even if Petitioner could make that showing, he has not alleged facts which, if true, demonstrate a violation of a federal constitutional right.  The Court recommends denying habeas relief as to claim three.

**E.    Claim Four**

Petitioner alleges in claim four that he was prejudiced by the cumulative effect of the preceding errors.  (ECF No. 1 at 6, 58.)  Respondent answers that Petitioner has failed to exhaust his state court remedies as to this claim because it was presented to the state appellate court on direct appeal but not included in the petition for review filed in the state supreme court.  (Ans. Mem. at 30.)  Respondent alternately contends there is no clearly

established federal law applicable to this claim, and even if there is, there are no errors to accumulate because only one error has been identified. (Id. at 30-31.)

Petitioner presented this claim to the state appellate court on direct appeal (Lodgment No. 3), which was denied in a reasoned opinion (Lodgment No. 5). It was not presented to any other state court. The state appellate court stated:

> Because we have found only one instance of harmless error with respect to the jury instructions regarding I.S.'s forensic interviews, we reject defendant's claim that cumulative error requires reversal of his convictions. (*People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error."].)

(Lodgment No. 5, People v. Storey, No. D065025, slip op. at 31.)

Respondent first contends the claim should be denied on the basis that Petitioner has not exhausted state court remedies. A state prisoner exhausts state court remedies by presenting a state's highest court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition. Granberry v. Greer, 481 U.S. 129, 133-34 (1987). A claim is "fairly presented" to a state's highest court if it is presented in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." Picard v. Connor, 404 U.S. 270, 275-76 (1971). Petitioner did not fairly present the California Supreme Court with an opportunity to reach the merits of this claim because he failed to present the claim to that court in his petition for review filed on November 9, 2015, more than three years ago, and has never presented the claim to that court. Nevertheless, for the following reasons, the Court finds the exhaustion requirement is satisfied because state court remedies no longer remain available.

The exhaustion requirement is technically satisfied when there is an absence of available state judicial remedies. See Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'"); Cassett v. Stewart, 406

17cv0023-LAB(MSB)

F.3d 614, 621 n.5 (9th Cir. 2005) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 732 (1991)) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him."). A return to the state supreme court to present this claim at this time would almost certainly be met with a state timeliness bar. See <u>Walker v. Martin</u>, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied); <u>see also</u> <u>Harris v. Reed</u>, 489 U.S. 255, 268 (O'Connor, J., concurring) ("[I]n determining whether a remedy for a particular constitutional claim is 'available,' the federal courts are authorized, indeed required, to assess the likelihood that a state court will accord the habeas petitioner a hearing on the merits of his claim."). The determination that no state court remedies remain as to this claim is further supported by the fact that, as discussed in detail below with respect to claim five, when Petitioner filed his habeas petitions in the state supreme court on April 13, 2017, and January 5, 2018, his claims were met with state procedural bars.[3]

Thus, the cumulative error claim is technically exhausted and procedurally defaulted in this Court. See <u>Coleman</u>, 501 U.S. at 735 n.1 (1991) (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); <u>see id.</u> at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently

_____

[3]  Even to the extent state court remedies remain available, the Court has discretion to reach the merits of the claim irrespective of Petitioner's failure to present the claim to the state supreme court. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The Court would have to find it does not present a colorable claim for relief. <u>Cassett</u>, 406 F.3d at 623-24 (holding "that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim."). Because Petitioner has identified only one error, an allegation of cumulative error does not present a colorable claim.

applied); <u>Bennett v. Mueller</u>, 322 F.3d 573, 581 (9th Cir. 2003) (holding that the California timeliness rule is an independent state procedural ground); <u>Walker</u>, 562 U.S. at 312-21 (holding that the California timeliness rule is clearly established and consistently applied). The Court may reach the merits of a procedurally defaulted claim if there is cause for the failure to satisfy the rule and prejudice from the default, or if a fundamental miscarriage of justice would arise from not reaching the merits of the claim. <u>Coleman</u>, 501 U.S. at 750.

The Court need not determine whether Petitioner can excuse the default because the cumulative error claim is insufficiently meritorious to provide for federal habeas relief. The Ninth Circuit has stated: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997)) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.").

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing <u>Chambers,</u> 410 U.S. at 298, 302-03). Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996). "In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." <u>Id.</u>

Petitioner contends that the four days of deliberations, the requests by the jury for read back of testimony and to view video exhibits, and their inability to reach verdicts on the counts relating to K.S., show that the case against him was close. <u>See e.g.</u> <u>Thomas v. Chappell</u>, 678 F.3d 1086, 1103 (9th Cir. 2012) (holding that five days of deliberations coupled with requests for read back of testimony "strongly suggest that the case was close."). However, the evidence was not weak, as it was based on eyewitness testimony,

17cv0023-LAB(MSB)

medical evidence, and expert witness testimony, and ultimately required the jury to make determinations regarding the credibility of child witnesses. In any case, Petitioner has identified only one error, and has not supported his contention that he was prejudiced by the cumulative effect of multiple errors. That error, and the two other alleged errors (instructional error on the statute of limitations and exclusion of cumulative and duplicative evidence challenging his prior conviction), are, as set forth above, all clearly harmless. Thus, even if all three are errors, their "combined effect" did not render the trial "fundamentally unfair." Runnels, 505 F.3d at 927. Based on a de novo review, the Court recommends habeas relief be denied as to claim four.

## F.    Claim Five

Petitioner contends in his final claim that he was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments by his trial counsel's failure to conduct an investigation, discuss the discovery with him, and settle on a trial strategy, which resulted in counsel's failure to: (1) present evidence that I.S. denied abuse for nine months through twenty-two therapy sessions and was coerced by the prosecutor to testify against Petitioner; (2) object to allowing the jury to hear about his prior conviction during voir dire; (3) object that he was not properly arraigned; (4) object that he was not timely arraigned; (5) present evidence that the initial allegations of molestation were submitted to law enforcement by E.S., not by Dr. Fairbanks or Peggy Lopez as the prosecutor represented, and argue there was no basis to proceed with his prosecution when E.S. later admitted she had no knowledge of molestation; (6) seek dismissal of the charges at the preliminary hearing on that basis; (7) object to the trial court reversing its pre-trial ruling that evidence regarding the heart-shaped rock in I.S.'s vagina was inadmissible; (8) present the victims' school records and statements from their teachers and school staff showing they did not exhibit signs of molestation at school; (9) present evidence that the triggering date for the statute of limitations as to the counts involving V.S. arose when she disclosed her allegations in detail to her therapist in 2005; (10) present evidence that V.S. did not make her allegations until she joined a "cult church" in 2005; (11) present evidence

that V.S. did not call Child Protective Services in 2005, as the prosecutor represented; (12) present evidence that V.S. is not the person shown in the video clip of the vagina; (13) present evidence that V.S. lied at the preliminary hearing when she testified Petitioner had impregnated her five times resulting in one abortion and four miscarriages; (14) present evidence that V.S. was unable to describe the unusual anatomy of Petitioner's erect penis; (15) present evidence that he never lived in a mountainous area of Los Angeles as testified to by V.S.; (16) present evidence that he could not have molested V.S. while her boyfriend was in the apartment as testified to by V.S. because it was a studio apartment; (17) impeach V.S. more fully with her testimony from his 1995 trial; (18) properly advise him regarding testifying on his own behalf; and (19) object to the prosecutor's excessive use of leading questions to V.S. (ECF No. 48 at 6-54.) He alleges that prosecutorial and judicial misconduct resulted from: (1) the excessive use of leading questions to V.S.; (2) the prosecutor's false identification of the anonymous caller who reported allegations of molestation to Child Protective Services; (3) the introduction of the improperly authenticated video clip of the vagina; (4) allowing V.S. to falsely testify she had sex with Petitioner while her boyfriend was in their apartment; and (5) informing the jury during voir dire of his prior conviction. (Id. at 35-38, 46, 51-56.) Finally, he alleges his appellate counsel was ineffective for failing to raise all those claims on appeal. (Id. at 6-56.) He presented the same claims in his original federal Petition, absent the allegations of ineffective assistance of appellate counsel. (ECF No. 1, Ex. F; ECF No. 3 at 2-5.)

Respondent answers that these claims should be dismissed as untimely because, although they were raised in the timely-filed original Petition, they were unexhausted at that time, and Petitioner did not begin to exhaust state court remedies as to these claims until after the one-year statute of limitations expired. (Ans. at 2-3; Ans. Mem. at 8-14.)

The one-year statute of limitations applicable to federal habeas petitions pursuant to 28 U.S.C. § 2254 begins to run at the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

17cv0023-LAB(MSB)

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.A. § 2244(d)(1)(A)-(D) (West 2006).

Because these claims rely on events which Petitioner was aware of at trial or on appeal, § 2244(d)(1)(A) provides the triggering date, which is last day he could have filed a petition for a writ of certiorari in the United States Supreme Court following the denial of his claims on direct appeal. <u>Bowen v. Roe</u>, 188 F.3d 1157, 1158-58 (9th Cir. 1999). The California Supreme Court denied the petition for review on January 13, 2016. (Lodgment No. 7.) The last day he could have filed a certiorari petition was April 13, 2016, and the one-year federal statute of limitations began to run the next day, April 14, 2016. <u>See</u> <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1246 (9th Cir. 2001) (holding that "in computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event, or default from the designated period of time begins to run shall not be included."). Petitioner had one full year, until April 13, 2017, to timely file a federal habeas petition.

The original federal habeas Petition in this action was presumptively constructively filed on December 29, 2016, (<u>see</u> ECF No. 1 at 12, 83), over three months before the statute of limitations expired. It included claim five, absent the ineffective assistance of appellate counsel claims, and was accompanied by a motion to stay these proceedings and hold the Petition in abeyance while Petitioner presented those claims on state habeas, (ECF No. 1, Ex. F; ECF No. 3). The stay motion was fully briefed on April 4, 2017. (ECF Nos. 9-10.) The first state habeas petition was filed on May 18, 2017, after the statute of limitations expired on April 13, 2017, and it was denied on August 16, 2017. (Lodgment Nos. 8-9.)

17cv0023-LAB(MSB)

On August 18, 2017, the Court issued a Report and Recommendation on the stay and abeyance motion recommending it be denied as moot because the claims had become exhausted on August 16, 2017. (ECF No. 24.) Petitioner filed a second stay motion on October 5, 2017, and a third stay motion on October 20, 2017, requesting permission to file a second habeas petition in the state supreme court to exhaust additional, but unidentified claims, and to submit additional documentary support. (ECF Nos. 31, 35.) On October 27, 2017, the Court adopted the Report and Recommendation, denied the original stay motion as moot, construed the second and third stay motions as requests to return to state court to file a second habeas petition, informed Petitioner such permission is not required from this Court, and granted him leave to file a motion to amend his original Petition on or before December 8, 2017. (ECF Nos. 33, 36.) Petitioner filed his second state habeas petition on January 5, 2018, (ECF No. 54-20), and filed a fourth stay and abeyance motion in this Court on January 8, 2017, (ECF No. 39).

On January 17, 2018, the Court denied the fourth stay motion because Petitioner had failed to demonstrate he had filed his second state habeas petition, (he had submitted it to the state court when he filed his fourth stay motion but had not received verification it had been filed), without prejudice to Petitioner to submit another stay motion on or before February 15, 2018, showing that he had filed his second state habeas petition or to proceed with his original Petition. (ECF No. 40.) Petitioner filed a fifth stay motion on February 1, 2018. (ECF No. 42.) On June 7, 2018, the Court denied that motion as moot because the second state habeas petition had been denied on April 11, 2018, and set a deadline for Petitioner to amend his original federal Petition on or before July 11, 2018. (ECF No. 47.) Petitioner filed his First Amended Petition containing the newly exhausted claims on July 6, 2018. (ECF No. 48.)

Respondent argues that although Petitioner presented all of his claims, other than his ineffective assistance of appellate counsel claims, to this Court in his timely-filed original Petition, only the first three claims were exhausted at that time, and claim five is untimely because Petitioner did not begin to exhaust state court remedies until after the limitations

period expired on April 16, 2017. Petitioner argues that he attempted to begin exhausting his state court remedies prior to expiration of the limitations period by submitting his first state habeas petition to the state supreme court on April 13, 2017, the last day of the one-year federal statute of limitations, which was rejected on April 17, 2017, on the basis that he appeared to be requesting an extension of time to file a petition for review, but had not made a proper request. (ECF No. 14 at 2, Ex. A.) Petitioner resubmitted the habeas petition to the state supreme court on April 21, 2017, and it was returned to him unfiled on April 27, 2017, because it was not on a court-approved form. (Id., Exs. B-C.) Petitioner finally succeeded in having his first state habeas petition filed on May 18, 2017, over a month after the limitations period expired. (ECF No. 54-18.)

Because Petitioner presented all of his unexhausted claims, other than the claims of ineffective assistance of appellate counsel, in the original, timely Petition, if the Court had granted his motion for stay and abeyance, those claims would be timely despite the fact that the statute of limitations expired on April 13, 2017, before he first presented the claims to the state supreme court on May 18, 2018. See Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005) (holding that a state prisoner may timely file "a 'protective' petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted.") (citing Rhines v. Weber, 544 U.S. 269, 277 (2005)) (noting that granting a stay and abeyance "effectively excuses a petitioner's failure to present his claims first to the state courts."); King v. Ryan, 564 F.3d 1133, 1140 (9th Cir. 2009) ("When implemented, the Rhines exception eliminates entirely any limitations issue with regard to the originally unexhausted claims, as the claims remain pending in the federal court throughout."); see e.g. Red v. Runnels, No. C 04–04408 JW (PR), 2009 WL 4251562, at *5 (N.D. Cal. Nov. 23, 2009) (unpublished memorandum) ("The Court concludes that when a petitioner seeks a stay of proceedings under Rhines to exhaust unexhausted claims already contained in a timely federal petition, the relation back doctrine will not create a statute of limitations problem for the petitioner since the exhausted claims will, by definition, be identical to the claims already raised in the existing petition.").

Respondent argues that Petitioner is not entitled to the suspension of the statute of limitations arising from a <u>Rhines</u> stay because he was not diligent in returning to state court, as he had about three months left of the statute of limitations when he requested a stay but waited four months to file his state habeas petition. (Ans. Mem. at 9-11.) Because the Court denied Petitioner's motion for stay and abeyance as moot, no adjudication has ever been made whether he satisfied the <u>Rhines</u> requirements. Although the Court suggested in its January 17, 2018, Order that Petitioner had not yet established diligence or good cause for failing to timely exhaust as required by <u>Rhines</u> (see ECF No. 40 at 3-5), the Court permitted him to file an additional stay and abeyance motion, anticipating a future determination whether he could satisfy <u>Rhines</u>, which never occurred because his motion was denied as moot once his claims were denied in state court.

In order to satisfy <u>Rhines</u>, a petitioner must establish: (1) good cause for his failure to exhaust his claims in state court, (2) that at least one of his unexhausted claims is not plainly meritless, and (3) he has not engaged in abusive or dilatory litigation tactics. <u>Dixon v. Baker</u>, 847 F.3d 714, 720-22 (9th Cir. 2017). The good cause requirement can be satisfied by showing, as Petitioner alleges, that his appellate counsel was ineffective in failing to raise the claims, or simply because Petitioner proceeded pro se in his state habeas proceedings. <u>See id.</u> at 720 (holding that good cause is satisfied where petitioner satisfies the standard set forth in <u>Martinez v. Ryan</u>, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceedings, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.").

The diligence requirement is not defeated by the fact that Petitioner waited until the last day of the one-year limitations period to (ineffectually) submit his claims to the state court. <u>See Grant v. Swarthout</u>, 862 F.3d 914, 920 (9th Cir. 2017) (noting that state habeas petitioners are entitled to utilize their entire one-year period to exhaust state court remedies, as "one might even conclude that the period is too short to allow many prisoners, especially

the vast majority who are acting pro se, to investigate, research, and fully prepare such complex and lengthy legal documents."). Petitioner attempts to show he was diligent by attaching to his stay motion state court orders denying his requests for copies of his trial transcripts, by contending the delay in presenting his claims to the state court was caused by a delay in obtaining his trial transcripts from his appellate counsel, and by claiming that his appellate counsel should have raised the claims on direct appeal. (ECF No. 1 at 64-76; ECF No. 3 at 1.)

Assuming Petitioner could show diligence and good cause for failing to timely present the claims to the state court, the Court would then have to examine the merits of the claims to determine if they are substantial. See Martinez, 566 U.S. at 14 (holding that a claim is "substantial" if the petitioner can show that "the claim has some merit."). Furthermore, assuming Petitioner fails to satisfy Rhines, the Court would need to determine if he is entitled to equitable tolling of the limitations period, either as a result of the delay by this Court in ruling on his stay motion, or because his one-month delay in presenting his claims to the state court after expiration of the statute of limitations was caused by lack of access to his trial transcripts, by ineffective assistance of appellate counsel, or from an excusable failure to satisfy state procedural rules. See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc) (holding that a district court must develop the record where there are allegations which, if true, would support equitable tolling); Lett v. Mueller, 304 F.3d 918, 922-25 (9th Cir. 2002) (lack of access to legal materials can support equitable tolling); Spitsyn v. Moore, 345 F.3d 796, 801-02 (9th Cir. 2003) (ineffective assistance of appellate counsel can support equitable tolling); Corjasso v. Ayers, 278 F.3d 874, 878 (9th Cir. 2002) (delay by district court can support equitable tolling).

Apart from the timeliness issue, as a general rule, federal habeas courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that

17cv0023-LAB(MSB)

might otherwise have been available." Ylst, 501 U.S. at 801 (citing Harris v. Reed, 489 U.S. 255, 262 (1989)). Petitioner first presented his claims of ineffective assistance of trial counsel, and judicial and prosecutorial misconduct, to the state supreme court in a habeas petition, which was denied in an order that stated:

> The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474 (a petition for writ of habeas corpus must include copies of reasonably available documentary evidence); *In re Swain* (1949) 34 Cal.2d 300, 304 (a petition for writ of habeas corpus must allege sufficient facts with particularity.).) Individual claims are denied, as applicable. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 (courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal).) Corrigan, J., was absent and did not participate."

(Lodgment No. 9.)

Petitioner presented the same claims, along with his additional allegations that his appellate counsel was ineffective for failing to present those claims on appeal, in a second habeas petition filed in the state supreme court, which was denied in an order that stated:

> The petition for writ of habeas corpus is denied. (see *In re Clark* (1993) 5 Cal.4th 750, 767-769 (courts will not entertain habeas corpus claims that are successive); *People v. Duvall* (1995) 9 Cal.4th 464, 474 (a petition for writ of habeas corpus must include copies of reasonably available documentary evidence); *In re Swain* (1949) 34 Cal.2d 300, 304 (a petition for writ of habeas corpus must allege sufficient facts with particularity.).) Individual claims are denied, as applicable. (See *In re Miller* (1941) 17 Cal.2d 734, 735 (courts will not entertain habeas corpus claims that are repetitive).)

(Lodgment No. 11.)

Where a state court order invokes more than one procedural bar to deny multiple claims but fails to specify which rule applies to which claims, federal habeas review is not barred unless all of the cited state procedural bars are adequate to support the judgment and independent of federal law. Washington v. Cambra, 208 F.3d 832, 834 (9th Cir. 2000).

Because Petitioner argues that any default should be excused because his appellate attorney was ineffective in failing to raise claim five in state court, the Court would have to examine the merits of his ineffective assistance of appellate counsel claims (which are

17cv0023-LAB(MSB)

in essence identical to the underlying claims), to determine if he can overcome a procedural default. See Murray v. Carrier, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."). And because Petitioner proceeded pro se during his state habeas proceedings, he can overcome a procedural default as to the ineffective assistance of trial counsel claim if he can establish a "substantial" claim. See Martinez, 566 U.S. at 17 ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."). The Court must also examine the merits of the ineffective assistance of trial counsel claims and the judicial and prosecutorial misconduct claims in order to determine if they present "substantial" claims sufficient to excuse any default. See id. at 14 (holding that a claim is "substantial" if the petitioner can show that "the claim has some merit."). The AEDPA limitation on expanding the record does not apply in making that determination. See Dickens v. Ryan, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (holding that a petitioner is "entitled to present evidence to demonstrate that there is 'prejudice,' that is that petitioner's claim is 'substantial' under Martinez. Therefore, a district court may take evidence to extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under Martinez.").

As previously noted, the Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."). Because the claims encompassed within claim five clearly fail on the merits, the Court finds that the interests of judicial economy counsel in favor of denying them without finding whether they are timely, whether and to what extent they are procedurally

17cv0023-LAB(MSB)

defaulted, whether Petitioner can excuse any default, or whether he has or still must satisfy the <u>Rhines</u> requirements for a stay.

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that <u>Strickland</u> "has long been clearly established federal law determined by the Supreme Court of the United States."). Petitioner must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. He must also show counsel's deficient performance prejudiced his defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel. <u>Id.</u> at 687.

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "The standards created by <u>Strickland</u> and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

Petitioner alleges his trial counsel failed to discuss the discovery with him and settle on a trial strategy, and failed to conduct a full investigation in response to issues and items of evidence pointed out by Petitioner, which resulted in counsel's deficient performance in numerous instances. First, it caused counsel to rely only on the evidence presented by the prosecutor to show that prior to I.S. testifying she repeatedly and consistently denied she had been molested by Petitioner, resulting in defense counsel's failure to present additional

17cv0023-LAB(MSB)

evidence I.S. had also denied abuse for nine months during twenty-two therapy sessions, and that her therapy was discontinued for that reason. (ECF No. 48 at 6-8.) Evidence was presented at trial that I.S. consistently denied Petitioner placed the heart-shaped rock in her vagina, denied she told her aunt Marena she was abused, and denied in all four of her forensic interviews that Petitioner touched her. Even assuming Petitioner could show that she had made similar denials during therapy, and assuming it would have been admissible, it is cumulative to the evidence of her repeated and adamant denials. Petitioner has not demonstrated "a probability sufficient to undermine confidence in the outcome" of his trial by his trial counsel's failure to discover that I.S. had also denied abuse during therapy. Strickland, 466 U.S. at 694.

Petitioner also alleges the prosecutor coerced I.S. into testifying falsely because I.S. steadfastly denied he had inappropriately touched her until the prosecutor spoke to her just before she testified at the preliminary hearing, where for the first time she said Petitioner touched her inappropriately. (ECF No. 48 at 6-8.) Defense counsel did in fact argue in closing that I.S. must have been coached in order to change so abruptly from her consistent and adamant denials of abuse. (RT 3313-15.) Petitioner admits he does not know what the prosecutor said to I.S., (id. at 19), and his allegation of coercion is entirely conclusory. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) (denying habeas relief on the basis that "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

Petitioner alleges counsel failed to object to the jury being informed during voir dire of his prior conviction, arguing that it had been ruled inadmissible prior to trial and stereotyped him to the jury as a bad person. (ECF No. 48 at 9-12.) Defense counsel filed a pre-trial motion to exclude evidence of the prior conviction, (CT 168-88), and presented a lengthy argument at a pre-trial hearing contending it would be unfair not to allow the defense to relitigate it if the prior conviction were introduced, (RT 10-15). The trial judge ruled it was admissible. (RT 15-16.) Counsel re-raised the issue during V.S.'s testimony and again before Petitioner testified. Petitioner has failed to show his counsel was deficient

in any manner in attempting to prevent the jury from learning about his prior conviction, or that he was prejudiced as a result of the jury learning of it during voir dire rather than at trial.  See Richter, 562 U.S. at 110 (quoting Strickland, 466 U.S. at 686) ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.").

Petitioner next claims counsel failed to object that although Petitioner was arrested on April 5, 2012, on a domestic battery charge against his wife Canesha, he was arraigned on April 11, 2012, on two-year old domestic battery charge involving E.S.  (ECF No. 48 at 13-15.)  The record shows that Petitioner was arraigned on the instant charges on April 11, 2012 (CT 1-9, 538), and there is no support for his contention that his April 11, 2012 arraignment was on a two-year old domestic battery charge.  Petitioner also alleges his trial counsel failed to object that his April 11, 2012 arraignment took place more than 72 hours after his April 5, 2012 arrest, in violation of state law, and that his August 7, 2012 arraignment on the second amended felony complaint, which was filed on July 23, 2012, was also untimely.  (ECF No. 48 at 16.)  However, Petitioner has not alleged how he was prejudiced by the untimely arraignment, and counsel was not deficient in failing to bring a futile motion.  See People v. Mesaris, 201 Cal.App.3d 1377, 1384 (1988) (stating that California law authorizes dismissal of charges based on an untimely arraignment only where the defendant suffers actual prejudice as a result of the delay); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.").

Petitioner alleges his trial counsel failed to present evidence that the allegations which gave rise to the counts involving K.S. and I.S. were initially reported to law enforcement by his daughter E.S. or her aunt Mrs. Hinton, and not by Dr. Fairbanks or Child Protective Services employee Peggy Lopez as represented by the prosecution.  (ECF No. 48 at 17-20.)  He provides the following timeline: (1) he was arrested on October 16, 2011, for domestic violence against Canesha based on a false report by E.S. that Petitioner choked Canesha; (2) E.S. falsely reported the event because "petitioner has had numerous

physical fights [with E.S. and she] was very mad at the petitioner and looking for revenge";
(3) he was arraigned on that charge on October 19, 2011; (4) the prosecutor told Canesha
she would not be needed at the arraignment, despite Canesha having told the prosecutor
that she had not been choked by Petitioner; (5) the trial judge indicated a willingness to
drop the charges but wanted to hear from Canesha first, and released Petitioner on his own
recognizance with a future hearing date; (6) Canesha was threatened by the San Diego
Regence Treatment Center that unless she obtained a restraining order until the matter was
settled Child Protective Services would remove K.S. and I.S. from her home, so she
obtained a restraining order preventing Petitioner from returning home; (6) E.S., aware of
the restraining order, called Child Protective Services on October 19, 2011, and reported
that Petitioner was in their home molesting K.S. and I.S.; (7) Child Protective Services
went to the school attended by K.S. and I.S. that day and took them into protective custody
despite their denials that Petitioner inappropriately touched them; and (8) the police
searched Petitioner's home that day but did not find him there. (Id. at 17-18.) He contends
that although the initial allegation by E.S. gave the prosecution a basis to charge him in
this case, she testified at his preliminary hearing that she had no knowledge of him
molesting K.S. and I.S., and at that point counsel should have moved for a dismissal of the
charges because there was no basis for the current prosecution. (Id. at 18-20.) He contends
that Peggy Lopez initiated an investigation into whether I.S. was molested after I.S. went
to the hospital to have the heart-shaped rock removed from her vagina, despite the fact that
I.S. told Lopez she put it there herself and despite the fact that Dr. Fairbanks did not see
any injuries which would make him suspect sexual abuse. (Id. at 21-24.) He argues the
prosecution was aware they had no basis to charge him with a crime at that point, and so
the prosecution falsified evidence that Dr. Fairbanks had referred the matter for
investigation into whether I.S. was molested. (Id.)

At a pretrial hearing the prosecutor sought to introduce the testimony of Peggy Lopez
in order to avoid an anticipated defense argument that Child Protective Services became
involved based on false allegations of abuse by E.S. or Marena Hinton, and to give the jury

a timeline of the events.  The prosecutor represented that although the incident involving the heart-shaped rock was what initiated the investigation which led to the instant charges, Child Protective Services had visited Petitioner's home multiple times beginning from when he was released on parole for his conviction for molesting E.S., not only because he was a registered sex offender who violated parole several times, but because there were domestic violence reports leading to observations of neglect and non-sexual abuse in his household.  (RT 24-28, 425-27.)  Defense counsel replied that Child Protective Services removed the children based on domestic violence and non-sexual abuse arising from Canesha's mental instability and her inability to properly care for the children, which they discovered because the neighbors filed false complaints in an attempt to remove Petitioner, a registered sex offender, from the neighborhood.  (RT 257-69, 427-33.)  Defense counsel argued that the children only disclosed sexual abuse once they were in protective custody for Canesha's neglect, and therefore the numerous visits by Child Protective Services were relevant to show that no signs of sexual abuse were ever present in the household.  (Id.)  The trial judge limited that evidence, and Peggy Lopez did not testify at trial as to that history.  Dr. Fairbanks testified that he did not contact Child Protective Services, but hospital protocol may have caused them to be notified.  Petitioner has not shown that the prosecution falsely represented that Dr. Fairbanks initiated the investigation.  To the extent he alleges there was a fraudulent basis for bringing the charges against him, or an insufficient basis to continue with the prosecution after the preliminary hearing, his contention is without merit because the children did eventually report abuse, and K.S. and I.S. testified at the preliminary hearing Petitioner had inappropriately touched them.  To the extent he contends his defense strategy that the charges were based on animus by E.S. would have been strengthened by evidence she was the reporting party rather than the professionals, he has not shown defense counsel was in any manner deficient with respect to the handling of this evidence, and has not shown "a probability sufficient to undermine confidence in the outcome" of his trial in this respect.  Strickland, 466 U.S. at 694.

17cv0023-LAB(MSB)

Petitioner next alleges his trial counsel failed to object to the introduction of evidence regarding the heart-shaped rock in I.S.'s vagina on the basis it was irrelevant and had been ruled inadmissible prior to trial. (ECF No. 48 at 26-27.) Defense counsel presented a lengthy argument at a pre-trial motion hearing seeking to exclude evidence regarding the rock on the basis that I.S. never wavered in her story that she inserted it herself, and the only contradictory evidence was a statement by her aunt Marena who reported I.S. told her Petitioner put the rock in her vagina. (RT 18-28.) The trial judge ruled evidence of the rock admissible, finding its probative value outweighed any prejudice because the jury could decide who was telling the truth, and because it "is what kicks off this investigation and gives context to why CPS gets involved, why the police get involved eventually." (RT 28.) Petitioner has not presented a credible claim that counsel was deficient in failing to object to this evidence on the basis it was ruled inadmissible prior to trial. See Rupe, 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.").

Petitioner alleges his trial counsel was ineffective for failing to obtain and present school records of K.S. and I.S., and statements from their teachers and school staff, to show that no acts of molestation occurred on school grounds and that they did not exhibit signs of molestation. (ECF No. 48 at 28-29.) No evidence was presented at trial that the girls showed signs at school of having been molested, and there was no need for rebuttal evidence they showed no such signs. Petitioner has not shown counsel was deficient in failing to seek to introduce such marginally relevant evidence, or that he was prejudiced as a result. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995) ("While the Sixth Amendment requires an attorney to look for evidence that corroborates the defense he pursues, the Sixth Amendment has not been expanded to require an attorney to hunt down such marginally relevant and indirectly beneficial evidence.").

Petitioner alleges his trial counsel failed to present expert testimony that the one-year statute of limitations on the counts involving V.S. began when she disclosed her allegations in detail to her therapist in 2005, because they must have been reported to law enforcement as there is a mandatory reporting requirement. (ECF No. 48 at 30-31;

Traverse at 4.) V.S. testified at trial that she told her therapist twice that she was concerned that K.S. and I.S. were in danger of being molested, and, when she was told by her therapist there was a mandatory reporting duty and the therapist had to report it to Child Protective Services, testified that her response was: "I said please do." (RT 1404-05.) She also testified that she herself reported the same thing to Child Protective Services at that time, not to law enforcement. Petitioner has not shown law enforcement was informed at that time, and has presented no evidence to rebut Detective Burow's testimony that there was no record of law enforcement being notified prior to 2011.

Petitioner contends his trial counsel did not introduce evidence that V.S. made her allegations only after she joined a "cult church" in 2005, which separated her from her husband and where she "became the cult church's leader's mistress," and that she only accused him after he criticized the church because it took all her savings. (ECF No. 48 at 32-33.) He also claims counsel should have impeached V.S. with evidence that there were no Oprah shows about child molestation in 2004-05, and by pointing out that her testimony that law enforcement told her in 1995 that they could not act on her allegations of molestation because she did not know where Petitioner lived was false because he was a registered sex offender at the time and law enforcement always knew where he lived. (Id. at 33-34.) However, V.S. clarified that she called Child Protective Services in 2005, not the police, and said "from what I remember, I couldn't give an exact location of where he was so, therefore, they could not really help me." (RT 1345.) Counsel impeached V.S. in several ways, including when and why she first reported she had been abused. Petitioner has not shown deficient performance for failing to attempt to further impeach her as to why she came forward, including when the Oprah show addressed molestation or the nature of the support she received from her church. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Neither has he shown prejudice from counsel failing to attempt to further impeach V.S. regarding what

prompted her to come forward, as there is not "a probability sufficient to undermine confidence in the outcome" of his trial as a result. Id. at 694.

Petitioner next alleges defense counsel failed to object when the prosecutor falsely represented that V.S. made the November 15, 2005 anonymous call to Child Protective Services, as the recording stated that when the caller "was a minor she was molested by the father along with her sister," which he argues could not have been V.S. because V.S. is an only child. (ECF No. 48 at 35-37.) However, V.S. referred to E.S., K.S. and I.S. as her sisters throughout her trial testimony, and when shown a transcript of the 2005 call to Child Protective Services she said she thought it was the report she made. (RT 1400-01.) Petitioner has not stated a plausible claim that the prosecutor falsely represented that V.S. had made that call, and has not shown defense counsel was deficient in failing to object on that basis or prejudice as a result.

Petitioner next alleges his trial counsel failed to present any evidence, other than Petitioner's testimony, that V.S. is not the person shown in the video clip of the vagina, and claims the prosecution presented false evidence she was that person. (ECF No. 48 at 38-39.) He states that the video shows a female from behind from her buttocks to her legs bent over at the waist, and contends defense counsel could have determined whether scars which are visible on V.S. were visible on the video, and could have shown that the woman in the video weighed between 160-170 pounds, whereas V.S. weighed between 110-115 pounds when she was between the ages of 14-20. (Id.) However, Petitioner testified at trial that he could not identify the person in the video clip despite admitting that he and V.S. walked around in their undergarments in front of one another. (RT 3075, 3200.) He could have at that time testified that she had scars which were not visible on the video clip, and there is no basis to ascribe the failure to present that evidence to deficient performance of defense counsel, or that it would have affected the outcome of the trial. See Strickland, 466 U.S. at 687 (holding that a showing of deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

17cv0023-LAB(MSB)

Petitioner alleges his trial counsel failed to present evidence that V.S. lied at the preliminary hearing when she said Petitioner had impregnated her five times resulting in one abortion and four miscarriages. (ECF No. 48 at 40-41.) He states that the prosecutor informed defense counsel that there were no hospital records indicating V.S. ever had an abortion, and contends defense counsel should have presented that evidence at trial. (Id.) Defense counsel filed a pre-trial motion to exclude as prejudicial evidence that V.S. had been impregnated by Petitioner numerous times, (CT 160), and argued that the lack of a hospital record of an abortion was irrelevant due not only to the passage of time, but also because V.S. said Petitioner gave her pills to induce abortions and miscarriages and she did not visit hospitals or medical providers for any of her pregnancies, (RT 412-15). The decision by defense counsel not to introduce such evidence clearly falls within the "wide latitude counsel must have in making tactical decisions." Strickland, 466 U.S. 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Neither has Petitioner shown "a probability sufficient to undermine confidence in the outcome" of his trial as a result of his counsel's failure to show that hospital records were not available to support V.S.'s testimony at the preliminary hearing that Petitioner had impregnated her, as she could have presented damaging testimony at trial in rebuttal that he gave her drugs to induce abortions and miscarriages. Strickland, 466 U.S. at 694.

Petitioner alleges defense counsel failed to present evidence that V.S. was unable to describe the unusual anatomy of his erect penis in order to impeach her testimony that they had frequent intercourse. (ECF No. 48 at 42-43.) He contends that his erect penis has an unusual shape, and that he asked defense counsel to ask V.S. if she was able to describe it, but counsel told him he would not ask her because he did not know what she would say. (Id. at 42.) The decision by defense counsel not to ask V.S. to describe Petitioner's erect penis was clearly within the "wide latitude counsel must have in making tactical decisions." Strickland, 466 U.S. at 689.

Petitioner alleges his trial counsel failed to present evidence that he never lived in a mountainous area of Los Angeles as testified to by V.S., stating that the prosecution was not able to locate a residence for him in such an area using utility bills. (ECF No. 48 at 44-45.) V.S. testified that the first time Petitioner touched her was during a Christmas holiday at his house "in the mountains" of Los Angeles. (RT 1287.) As Petitioner acknowledges, V.S. was nearly 40 years old when she testified at trial, and was testifying about the first time she went to his house when she was 11 years old, having just moved to Los Angeles. He has not shown "a probability sufficient to undermine confidence in the outcome" of his trial as a result of counsel's failure to impeach V.S. with evidence there was a lack of evidence he ever lived in a mountainous area of Los Angeles. Strickland, 466 U.S. at 694.

Petitioner alleges his trial counsel failed to present evidence that he could not have molested V.S. while her boyfriend was in their apartment near Slauson Avenue in Los Angeles, as testified to by V.S., because it was a studio apartment. (ECF No. 48 at 46-47.) V.S. testified that on one occasion when her boyfriend spent the night, Petitioner asked her to come sleep with him, and told her if she did not have sex with him, he would send her boyfriend home, so she had sex with Petitioner. (RT 1310-11, 1373-74.) She said she could not remember exactly where the apartment was and described it as having a bedroom, a living room, a kitchen and a bathroom, and did not say where her boyfriend was while she and Petitioner had sex. (RT 1310.) Petitioner testified that when he separated from Esther he and V.S. moved into an apartment together. (RT 3113.) He did not describe the apartment, and when asked if the incident with the boyfriend as described by V.S. had happened, he merely said: "She wasn't allowed to have a boyfriend until she was 18." (RT 3058.) Thus, he had the opportunity at trial to deny the event happened, or to explain it could not have happened because of the size of the apartment, but did not do so, and has made no showing that he was unable to have sex with V.S. while her boyfriend was asleep in some other area of the apartment.

Petitioner alleges defense counsel should have more fully impeached V.S. with her testimony from his 1995 trial. (ECF No. 48 at 48.) Defense counsel did in fact impeach

V.S. by having her admit she testified falsely at the trial because she thought Petitioner was not guilty at that time, and used it to try to show it was because V.S. was aware that E.S. had admitted to having fabricated her allegations. The trial judge excluded evidence from the 1995 trial despite repeated attempts by defense counsel to challenge the conviction. Petitioner does not indicate what more counsel could have done to impeach V.S. with her 1995 testimony, and this claim fails as conclusory. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations are insufficient to support a claim of ineffective assistance of counsel).

Petitioner alleges counsel failed to properly advise him regarding testifying on his own behalf. (ECF No. 48 at 49-50.) There are no specific allegations supporting this claim, as Petitioner merely states "there were no statements the prosecution could use to impeach the petitioner with, but throughout the trial, there were stereotype issues that prosecution presented, that would not have been able to be presented, had the petitioner not taken the witness stand." (Id. at 50.) This claim fails as conclusory. James, 24 F.3d at 26.

In his final allegation of deficient performance of trial counsel, Petitioner alleges counsel failed to object to the prosecutor's excessive use of leading questions to V.S., which he contends essentially allowed the prosecutor to testify for V.S. (ECF No. 48 at 53-54.) He argues that defense counsel did not object to the prosecutor's pre-trial motion to be allowed to use leading questions with V.S. (Id. at 54.) However, the prosecutor filed a pre-trial motion to treat Canesha as an adverse witness, not V.S. (RT 407.) Furthermore, defense counsel frequently objected as leading to questions to V.S. by the prosecutor at trial (RT 1300, 1302, 1317, 1322, 1333, 1347), as well as objecting as misstating V.S.'s prior testimony, (RT 1397, 1399), and on the basis the prosecutor was testifying, (RT 1400, 1422). Petitioner has not identified any leading question to which defense counsel was deficient in failing to object, or that any failure to object was not within the "wide latitude counsel must have in making tactical decisions." Strickland, 466 U.S. at 689.

Petitioner alleges prosecutorial and judicial misconduct as a result of: (a) the excessive use of leading questions to V.S.; (b) allowing the prosecutor to falsely identify

V.S. as the anonymous caller who notified Child Protective Services; (c) the introduction of the video clip of the vagina because it was not properly authenticated; (d) allowing V.S. to falsely testify she had sex with Petitioner while her boyfriend was in their apartment; and (e) informing the jury during voir dire of his prior conviction. (Id. at 35-38, 46, 51-56.) Claims of judicial and prosecutorial misconduct based on these allegations are entirely without merit for the reasons discussed above. See Miller, 483 U.S. at 765-66 (holding that in order to establish a claim of prosecutorial misconduct, a petitioner must show the prosecutor's actions amounted to constitutional error and the error was not harmless, and the reviewing court must look at the trial as a whole and place the alleged misconduct in context); Darden v. Wainwright, 477 U.S. 168, 181 (1986) (holding that in determining whether alleged prosecutorial misconduct rises to the level of constitutional error, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."); Withrow v. Larken, 421 U.S. 35, 47 (1975) (holding that to succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators."); Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) ("In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity.").

Finally, Petitioner alleges his appellate counsel was ineffective for failing to raise the foregoing claims on appeal. (ECF No. 48 at 6-56.) The Strickland standard applies to claims of ineffective assistance of appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000). As set forth above, Petitioner has not identified a meritorious claim appellate counsel failed to present. The failure to raise meritless or untenable claims does not constitute ineffective assistance of appellate counsel. Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance); Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable."). Because the claims which Petitioner contends his appellate counsel

should have raised on appeal are without merit, his claims of ineffective assistance of appellate counsel are likewise without merit.

The Court recommends habeas relief be denied as to claim five irrespective of any procedural bars or untimeliness because the claims contained therein clearly fail under de novo review.[4]

## V.   CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the First Amended Petition.

**IT IS ORDERED** that no later than **April 30, 2019**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 13, 2019.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  March 22, 2019

Honorable Michael S. Berg
United States Magistrate Judge

_____

[4]   Petitioner requests an evidentiary hearing.  (Traverse at 5.)  However, an evidentiary hearing is not necessary where, as here, the federal claims can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994); see also Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("It follows that if the record . . . precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

17cv0023-LAB(MSB)